157 N.J. Super. 478 (1978)
385 A.2d 240
J. AND E., PLAINTIFFS-RESPONDENTS,
v.
M. AND F., DEFENDANTS-RESPONDENTS,
v.
STATE OF NEW JERSEY, DEPARTMENT OF INSTITUTIONS AND AGENCIES, DIVISION OF YOUTH AND FAMILY SERVICES, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 23, 1978.
Decided February 24, 1978.
*481 Before Judges ALLCORN, MORGAN and HORN.
Ms. Marcia A. Membrino, Deputy Attorney General, argued the cause for appellant (Mr. John Degnan, Attorney General of New Jersey; Mr. William F. Hyland, former Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
Mr. Edmund R. Bernhard argued the cause for plaintiffs-respondents (Messrs. Bernhard, Durst & Dilts, attorneys).
Mr. Joseph Mezzacca, Jr., designated counsel, argued the cause for respondent (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Leslie Hill, Director, Legal Aid Society of Mercer County, filed a brief on behalf of respondent.
PER CURIAM.
The Division of Youth and Family Services (hereinafter "DYFS") appeals a trial court order declining to sever the parental rights of the two natural parents of a child, born to the mother during her incarceration in the Clinton Reformatory on a conviction of the manslaughter of another of her children and the abuse of yet a third. The natural father, too, had pleaded guilty to manslaughter and child abuse, and during all proceedings at the trial level was also confined. DYFS also appeals that portion of the order awarding custody to the maternal grandparents which entailed terminating the custody of foster parents with whom D. had lived for all but the first two months of her life. D. is presently about four years of age.
On June 8, 1973 F. and M., D.'s natural parents, were each sentenced to a 9-10 year prison term for the manslaughter of their son, F., Jr., then three years old, and the physical abuse of C., then 1 1/2 years of age. The convictions were based upon the parents' pleas of guilty. Although evidence of the circumstances of these crimes was *482 unaccountably excluded by the trial judge, the record nonetheless discloses facts which neither the parents nor plaintiff grandparents can seriously dispute. These facts are that F. Jr. was brought to Paul Kimball Hospital and pronounced dead on arrival by Dr. Romando Vives. According to Dr. Vives, the child had been dead a minimum of two hours, possibly six hours. "The line of lividity was confined to the child's lower extremities (buttocks and back of both legs) indicating that the child apparently died while in a sitting position, with his legs drawn up next to his body with his knees near his stomach." The body was abnormally cold, with a body temperature of 20 degrees centigrade. His body displayed surface skin damage, ulcers of the skin, crusted contusions, abrasions and lacerations. He was also suffering from malnutrition, dehydration, and gangrene of both feet. The nail of the right large toe was missing. He was found in clothing soaked in urine. The death certificate listed the cause of death as malnutrition, cerebral edema, multiple contusions, abrasions, ulcerations and lacerations.
C., F., Jr.'s younger sister, was found in the early morning hours of the day F., Jr. died, in her crib at her parents' home in Howell Township, New Jersey. She was under a wet blanket which covered her legs; her feet, legs and arms were infected and blistered, resulting in broken skin and open sores. The emergency room report diagnosed her condition as one of chronic emaciation due to starvation and characterized her as a battered child. When admitted to the hospital she weighed, at 18 months of age, only 15 pounds. The nurses at the hospital reported that she neither cried nor laughed, had no apparent reaction to anyone's approach and spent most of her time propped in a crib staring at nothing. She could neither walk nor talk. She had previously been hospitalized with a broken leg. DYFS, by court order, assumed C.'s custody following her release from the hospital, parental ties were severed with the consent of the *483 natural parents and without objection of plaintiff grandparents.
D., a fourth child, was born November 14, 1973 in the Hunterdon Medical Center, during her mother's custodial term which was being served at the Clinton Reformatory for Women. Before her birth, however, plaintiffs, her maternal grandparents, filed suit in the Chancery Division, Hunterdon County, seeking custody of the unborn child. Affidavit material by F., D's father, strongly suggests that the complaint was filed at his request in order that plaintiffs obtain and continue custody until his and his wife's release from custody, and the trial judge so found.
DYFS countered with a motion seeking temporary custody of D. The motion was granted shortly after her birth reserving to plaintiff grandparents rights of weekly visitation. D. was thereafter placed with foster parents in Bergen County, with whom she has resided until the present, and the grandparents religiously exercised their rights of visitation.
On December 16, 1973 DYFS filed answer to the grandparents' complaint and by way of counterclaim sought permanent custody of D., severance of parental rights and authorization to consent to D's adoption by others, who presumably will be the foster parents, not parties to this proceeding.
The matter was pretried on May 12, 1976, some 2 1/2 years after issue was joined. We have been provided with no satisfactory explanation of the inexcusable delay in reaching a final disposition of the issues posed in this litigation, and must, therefore, be content with admonishing the trial bench to move in matters of custody and the more serious termination-of-parental-rights cases with dispatch. The primary victim of any untoward delay will be the child. Moreover, extended delay may well affect the nature of the final disposition, as when emotional ties of a profound nature are created during that period. Expedition in all such *484 proceedings is an imperative necessity. See N.J.S.A. 30:4C-19.
At the hearing the grandparents, 64 and 69 years of age, testified that they have been married for over 41 years and reside in a medium-sized, comfortable home in a residential area for over 30 years. They are both in good health and profess an attraction and strong devotion to D. They are apparently financially independent and have the means to take care of D. should they be awarded her custody. Indeed, following an investigation, a Bergen County probation officer recommended that D.'s custody be given to plaintiffs, although with no rights of visitation by the natural parents. Nothing apart from their ages, their continuing close relationship with their daughter, and D's present circumstances, suggests that plaintiffs would not be good parents to D.
Although it is clear that plaintiffs initiated this action at the request of their daughter and son-in-law to hold custody of D. until they should be released from prison, they nonetheless vowed on the stand that should the court so order, they would not permit the mother or father to visit with the child. It should, however, be noted that the mother has been released from prison and is presently living with plaintiffs. F., the father, too has been released but his whereabouts are unknown.
Three caseworkers from the Division, a child psychiatrist, a child psychologist and a member of the New Jersey Parole Board testified for the Division. Ms. Angelica Fried, the original caseworker from the Division assigned to D.'s case, testified that in a conversation with plaintiffs, they told her that the police, the doctors and the hospital had exaggerated the condition of the deceased F. Jr.'s body and C.'s condition. When asked why they had not visited their grandchildren during the six months prior to F. Jr.'s death, they answered that the parents had not wanted to be interfered with and that the father, F., had not wanted them to visit. They simply complied.
*485 Ms. Constance Fraler, who had been assigned to D.'s case from the time D. was two months old until she was 15 months of age, observed the child in her foster home on at least three occasions and noted that D. appeared happy and relaxed, responding to her foster mother as would any normal, happy child of that age. Her relationship with her foster brother was described as a happy, affectionate and playful one. According to Ms. Fraler, the required visits with plaintiffs were attended with resistance from D. At an impending visit her entire body would stiffen, she would become expressionless and withdrawn. On return to her foster home she would again become a happy, smiling, relaxed and clinging child. Her relationship with her foster father was also described as harmonious and a normal daughter-father relationship.
Another caseworker, Ms. Linda Kowalski, also reported favorably on D.'s adjustment to her foster family. She, too, noted negative reactions upon D.'s leaving the foster home for visitation with the grandparents. She cried, screamed and pulled away from the car, refusing to get in. When she returned home she appeared ecstatic at her return.
Dr. Irving Markowitz, a practicing licensed psychiatrist in New Jersey for 30 years and Medical Director of the Family Services and Child Guidance Center for the last 25 years, conducted an evaluation of D., and her foster parents in December 1975. He observed D. to be a happy little girl and her relationship with her foster parents one of devotion, involvement and great warmth. He could see no reason for creating a traumatic situation for the child by removing her from the only home she had ever known. His opinion was based upon his own observations of the quality of the familial relationships in the foster home. He could predict only deleterious effects upon D. from removing her from her present home:
I think the sense of distrust, doubt, pervasive suspicion of individuals, possible embitterment may continue well into the adult *486 life of the individual * * * [S]eparation at a time when someone is of this age and this sensitive to possible separation is very likely to have very strong destructive effects.
According to Dr. Markowitz, the effect of such separation was the emotional equivalent of being orphaned and would range anywhere "from mild neurotic traits to very severe and even possible psychotic forms." He saw no benefit to the child in continuing her bond with the natural parents. Such a relationship would almost certainly be rivalrous and competitive, with the child being torn between two competing forces.
Mrs. Eleanor Nagy, a child psychologist, had examined D. on three separate occasions, once in the foster home and twice at the Hackensack Child Evaluation Center. D. was seven months old when examined in the home, and Mrs. Nagy confirms the excellent rapport between child and foster mother. Both other examinations, the last one on October 7, 1975, less than a year before judgment, disclosed no negative findings. The results of testing found D. within the normal range of development. She was secure, happy, active and strong-willed. Dr. Nagy, too, viewed any separation of D. from her foster parents with concern:
These are the only parents she knows, and this is where her identification is. And so, that she would face the feeling that these parents had died and to lose the sense of trust, to have this sense of trust disturbed is very harmful to a child and very frequently a child is not able to re-establish a sense of trust in another parent figure.
Once this sense of trust is undermined, Dr. Nagy testified, the child's future growth and development could be compromised:
If youngsters don't establish good internal relationships which [are] essentially based on trust then they tend to have shallow relationships through the rest of their lives and shallow relationships lead to many things. Their parents who have shallow relationships cannot be good parents because they cannot give their *487 children the depth of the feeling relationship that the children need. People who have shallow relationships frequently think primarily of themselves and they don't conform always to the rules and the needs of society. They are within themselves.
The effects of a child separated from those he has loved was described as occurring in three stages:
* * * [T]hat's the first thing the child tends to protest, the separation. It whines, it cries, it doesn't eat. Then if nothing is done, then the second phase in the child develops  sense of despair. He's tried to get back to the people he knows he trusts but it doesn't happen. So he tends to withdraw from that.
Now, the third and final thing in the relationship is that of detachment. At that point the child does become emotionally detached because it tends to detach itself from the world. And here's where you find the development of the shallow relationship. They never learn to trust other people. They stay behind this fortress they build.
According to Dr. Nagy, separation is most detrimental when it occurs between six months and five years of age, when a sense of trust is developed. "[T]he building blocks of sense of trust, of sense of security are being set."
No expert testimony contradicted the foregoing.
Although finding that M. left "something to be desired" as a mother prior to incarceration and that there was, as yet apparent, little evidence of rehabilitation, and that F., the father, left even more to be desired and showed even less evidence of being rehabilitated, and admitting that he would be unable to sleep nights were either of them to have custody of D., the trial judge nonetheless declined to sever parental ties. He rejected the caseworkers' testimony and the uncontradicted expert testimony, finding it too unequivocal in its forecast of doom for the child in the event of separation, and too empty of alternatives to be worthy of acceptance. He concluded, without ever meeting D., that she was "malleable," that removal from her foster parents would not be "an absolute irrevocable total destruction of this child." Accordingly, he awarded her custody to plaintiff *488 grandparents which entailed removal, on a gradual basis, from her foster family. This appeal ensued.
DYFS's action to sever parental ties proceeds under N.J.S.A. 30:4C-15, which provides, in pertinent part, that a petition for guardianship may be filed whenever "it appears that the best interests of any child under the care or custody of the Bureau of Childrens Services require that he be placed under guardianship." N.J.S.A. 30:4C-15(c). Decisional law construing the "best interests" test has dispelled the notion that all that need be shown is that DYFS will provide a better home for the child than the one provided by the natural parents. In re Cope, 106 N.J. Super. 336, 341 (App. Div. 1969), one of the few cases involving application of this provision, held that the "best interests" test required a petitioner for guardianship to
* * * demonstrate affirmatively that the child's "best interests" will be substantially prejudiced if he is permitted to remain with his parent  e.g., that his health and development have been or probably will be impaired and that the parent is unlikely or unwilling to change, or that the parent is in some way incapable of caring for the child or unwilling to do so.
In re Guardianship of B.C.H., 108 N.J. Super. 531, 539 (App. Div. 1970), interpreted the "best interests" requirement as imposing the burden of showing parental unfitness.
Under the cognate provisions of the adoption statute, N.J.S.A. 9:3-24 C, which has utility in matters brought under N.J.S.A. 30:4C-15(c) as a source of insight into legislative intention, the pertinent test for determining whether parental ties should be severed as a condition to adoption is whether the nonconsenting natural parent "has forsaken parental obligations." The phrase "forsaken parental obligations" is defined in N.J.S.A. 9:3-18 as a "willful and continuous neglect or failure to perform the natural and regular obligations of care and support of a child." In re Adoption of Children by D., 61 N.J. 89, 94-95 (1972), amplified this statutory definition "to require a past course of conduct *489 amounting to intended abandonment or very substantial neglect of both parental duties and claims, with no reasonable expectation of any reversal of that conduct in the near future." It noted that resolution of the question, often a difficult one, will depend upon the necessary unique circumstances of each case.
Reading together, in pari materia, the tests for severance of parental rights found in N.J.S.A. 9:3-24 C[1] and in the presently involved N.J.S.A. 30:4C-15(c)[2], we conclude that, as pertinent to the present case, the parental rights of a nonconsenting natural parent may only be severed when the petitioner for guardianship establishes by clear and convincing evidence "very substantial neglect of both parental duties and claims, with no reasonable expectation of any reversal of that conduct in the near future," by which the trier of the facts is convinced that the child's best interests will be substantially prejudiced by way of impairment to his mental or psychological health if he is permitted to remain with his parents or if his custody is to be returned to the *490 natural parents within the near future. In re Adoption of Children by D, supra; In re Cope, supra.
We have formulated this criterion for severance of parental rights by drawing on the statutory tests contained in the Title 9 adoption statute and the Title 30 provision governing applications for guardianship by DYFS, as construed by court decision, in the belief that the Legislature could not have intended different tests for severing parental rights to be applied depending upon the identity or status of the person making the application; whether the prospective adoptive parent makes the application for adoption necessitating severance or whether DYFS is the applicant for severance so that an adoption can be later arranged, the test should be the same despite the differences in statutory language used to describe the required factual predicate for severance.
It is only after a finding that the parents are unfit, in accordance with the foregoing test, and that parental ties should be severed, that the question as to physical custody of the child, in accordance with his best interests, should receive consideration. Hence, the evidence concerning plaintiffs' qualifications for D.'s custody, as well as the evidence of D.'s harmonious adjustment to her foster family, are largely irrelevant to the central issue posed, whether the parental ties with D. should be severed. We suspect from the trial judge's opinion that his conclusions resulted from an erroneous consideration of who should be given D.'s custody, as between the foster parents and the grandparents, as the primary issue. His conclusion that the grandparents should be given custody could only be given effect if parental ties remained intact.
Dominating the present case, of course, are the convictions of both natural parents for the manslaughter of their three-year-old son who was, from the uncontradicted evidence, found in almost unspeakable condition, and their contemporaneous convictions for child abuse and neglect of *491 their 18-month-old daughter whose sorry condition was discovered on the same day as the boy's death.
In the spring of 1973, and presumably while out on $5,000 bail, the parents fled to Canada and returned only pursuant to an extradition order obtained by the Monmouth County Prosecutor's office on March 31, 1973. Their bail was forfeited. Their pleas of guilty upon which their convictions were based followed.
At the pretrial conference it was stipulated that the natural father had never seen D. and the mother had not seen her since her birth. Although neither parent even seeks custody, probably because they are convinced that they could not be successful, the original reason for the grandparents' suit for D's custody was the parents' request that they do so. By a sworn letter, dated July 28, 1975, the father stated:
Because of my and my wife's fears and anxieties regarding the custody and future of our daughter, did call, request and demand upon the plaintiffs within this matter, J. & E., to institute and commence proceedings, namely Docket No. M-4000-73 which they did * * * for the express purpose of gaining custody of our daughter, D., be it temporary or otherwise, who is the subject of these aforementioned proceedings at our express consent, wishes and accord and to retain such custody until such time of our respective releases from incarceration.
Hence, the present action was not brought from any independent desire by plaintiffs to obtain custody of a child they had never seen but as surrogate for the parents, and to hold D.'s custody until her parents' release from confinement. The fact that they never sought C.'s custody, a child they did know, only emphasizes their status as acting for the natural parents. Both parents have achieved release from their confinement; the mother is presently in residence with the plaintiff grandparents; the father's whereabouts are unknown.
As noted, the trial judge found that the mother, M., "left something to be desired in the motherhood department prior to her incarceration." Although he duly noted that while *492 in confinement she had completed some courses in office-type work and has performed some service at Hunterdon Medical Center as a nurse's aide, matters essentially irrelevant to her fitness as a parent, he felt she had some distance to go. As for the father, he, according to the findings of the trial judge, left "a little more to be desired than [the mother] does." Little evidence of his rehabilitation could be found, including his escape from prison which resulted in an extension of his period of confinement. Nonetheless, he was "not in the slightest convinced that they have forfeited their parental rights by their former conduct, ipso facto. I don't think that it follows that the commission of the crimes they pleaded guilty to wipes them out as parents and cancels them and terminates them as parents forever * * *."
Despite our admittedly limited scope of review, and according to the trial judge deference with respect to those factual matters requiring an evaluation of credibility, we are nonetheless constrained to disagree. This is not a case where a natural parent's criminal record is offered as the sole evidence of parental unfitness. See In re Adoption of Children by D, supra at 97. Nor is this a case where one parent has committed a criminal act affecting the child's relationship with the other parent. See In re Adoption of J., 73 N.J. 68 (1977). Here, the criminal record is based upon an unequivocal admission by both parents of the unlawful killing of their three-year-old son and the gross abuse and neglect of their 18-month-old daughter. Clearly, in our view at least, such admissions disqualified them as parents at least as of the date when made. Indeed, we cannot conceive of a plainer case of parental unfitness or forsaken parental obligations. We are not here called to ponder upon the niceties of the parental role; rather we confront the fundamental obligation of parents to keep their children alive and in as reasonable a state of health as possible. In both of these areas both parents have failed abysmally. Although the circumstances surrounding the death at the age of 19 months of yet another of their children, S., were *493 never developed, and we cannot and do not draw any conclusions with respect thereto, we are constrained to observe that, with D's exception, out of three children, two have died in infancy and one, near starvation, was only spared that fate by fortuitous discovery. Nothing can convince us that parents failing so badly in their basic parental obligations should be entrusted with yet another young life. In our view, their past and continuous course of neglect to two of their three children should and does result in the forfeiture of their parental rights with respect to D. Nothing in the record suggests any dramatic change with respect to their capacity as parents to warrant our harboring the hope that D. can some day be safely returned to them, and the trial judge did not conclude otherwise. Although rehabilitation in a prison environment is an accepted objective of prison life, we cannot, where the future life of a four-year old girl is at stake, naively indulge the fiction that service of part of a ten-year sentence has achieved that goal.
Nor does the fact that D. herself was never mistreated by her parents have any legal or factual significance. Her removal on birth to the custody of DYFS and her parents' lack of access to her precludes any inferences, favorable or unfavorable, as to how they would have treated her. All any court can rely upon in determining whether to sever parental rights is the parents' past course of conduct, whether to the child in question or to other children in their care. Predictions as to probable future conduct can only be based upon past performance  and the record here is a poor one indeed. We cannot conceive that the Legislature intended to guarantee to parents at least one chance to kill or abuse each child. Evidence of parents' fitness or unfitness can be gleaned not only from their past treatment of the child in question but also from the quality of care given to other children in their custody.
We, therefore, conclude that the trial judge erred in rejecting DYFS's claim to guardianship and its demand that the parental rights of F. and M. to D. be severed.
*494 With that question resolved, plaintiff grandparents' rights to D's custody are resolved as well. A grandparent's right to custody, or even to visitation, can rise no higher than those of the natural parents. Although the evidence supports the trial judge's conclusions that the grandparents would make good parents for D., they have no recognized right to her custody, short of an application for her adoption, where the rights of the natural parents no longer exist. See Mimkon v. Ford, 66 N.J. 426, 430-31 (1975). Beyond this, however, plaintiffs' ages do not give D. the promise of familial stability which she should have, and her probable, and perhaps inescapable exposure, to her mother who is presently living with the plaintiffs presents other negative factors to plaintiffs' custody which cannot be ignored. We do not forget that plaintiffs did not seek custody of their other living grandchild, C., whom they knew, and that the initial motivation for their quest for D.'s custody was in response to the parents' demand that they do so in order that the parents could resume custody upon their release from prison.
Moreover, we do not ignore that D. has been given a good home in which she has lived for all but two months of her life. The trial judge did not find otherwise. In that home she has managed to establish a warm and responsible relationship with her foster family which, to her, constitutes her only family. We disagree with the trial judge's rejection of the uncontradicted expert testimony in the case, all of which expressed the not surprising view that removing a young child from the only home she has ever known is the equivalent of making her an orphan, an emotionally traumatic event. As we read the record, the opinions expressed were unequivocal because they were profoundly held and should not have been discredited as they were, on that basis alone.
Reversed and remanded for further proceedings not inconsistent with this opinion.
NOTES
[1] If the court shall determine, from the report of the approved agency and the evidence presented at the preliminary hearing, that a parent of the child sought to be adopted is dead, or mentally incompetent, or has forsaken parental obligations, or has been divorced by the other parent on grounds of adultery or desertion or extreme cruelty, the court may declare that such parent has no further right to custody of the child. If the court shall determine that the child sought to be adopted is illegitimate, the court shall declare that the father, and the husband of the mother if she be married, has no right as to custody of the child. If the court shall determine that a custodian or guardian has been appointed for the child sought to be adopted, but that such custodian or guardian has willfully and continuously neglected or failed to discharge the responsibilities of such appointment, the court may declare that such custodian or guardian has no further control and authority over the person of the child.
[2] Whenever * * * (c) it appears that the best interests of any child under the care or custody of the Bureau of Childrens Services require that he be placed under guardianship; * * *