171 N.J. Super. 520 (1979)
410 A.2d 79
D.Y.F.S.
v.
D.T. AND J.T.
IN THE MATTER OF THE GUARDIANSHIP OF J.A.T. AND J.T.T.
Superior Court of New Jersey, Juvenile and Domestic Relations Court, Hudson County.
Decided October 10, 1979.
*521 Joan Holleran Walsack, Deputy Attorney General, for the Division of Youth and Family Services, Department of Institutions and Agencies (John J. Degnan, Attorney General of New Jersey, attorney).
Elaine Davis for the natural mother.
Lester Garo for the natural father.
William F. Warnock for the maternal grandparents.
Thomas & Williamson for the paternal grandparents (Joseph R. Milone, Jr., of the New York Bar, appearing).
Louis Saunders for the foster parents of J.A.T.
Roy E. Kurnos for the foster parents of J.T.T.
Neil B. Fink guardian ad litem of J.A.T. and J.T.T.
HORNSTEIN, J.J.D.R.C.
This is an action to terminate the parental relationship pursuant to N.J.S.A. 30:4C-15 and 30:4C-20 between the natural parents, D.T. and J.T., and their two children, J.A.T. age 4, a girl, and J.T.T., age 3, a boy.
An unusual aspect of these proceedings was four applications to intervene. The maternal grandparents as a couple and the paternal grandparents as a couple sought to intervene. Each set *522 of grandparents desired custody of the children if the paternal relationship were to be terminated. Two sets of foster parents with whom the children are now residing  the boy in one home and the girl in another  each sought to intervene, not to seek custody, but to present testimony.
The pertinent facts as found by the court are these:
D.T., the mother of the children who are the subject of this controversy, was born October 22, 1953. She quit high school at age 16 and married J.M. She had three children from this marriage: S.M., born January 3, 1971, Sh.M. born April 11, 1972 and L.M. born September 8, 1973. She separated from her husband, and in 1974 or 1975 they were divorced.
On March 1, 1975 D.T. married J.T., the father of the children involved herein. J.A.T. was born June 14, 1975 and J.T.T. was born April 20, 1976.
On June 5, 1975 the New Jersey Division of Youth and Family Services (DYFS) filed a complaint against D.T. and J.T. under the provisions of N.J.S.A. 9:6-8.21 et seq., alleging child abuse and neglect. It should be noted that this was three months after D.T. and J.T. were married and nine days before D.T. gave birth to J.A.T. The M. children were removed from the household but two were returned under supervision of DYFS by court order dated June 20, 1975. The third child, Sh.M., the victim of extensive burns, remained in temporary custody of DYFS.D.T. and J.T. were required to undergo psychiatric examinations and counseling.
Eventually Sh.M. was returned to D.T. and J.T. and the child abuse complaint as it pertained to the first two children was dismissed; it was continued as to Sh.M.  he was to be under supervision of DYFS, by court order of September 15, 1975.
A second complaint alleging child abuse and neglect was filed by DYFS against D.T. and J.T. on August 24, 1976.
This complaint alleged abuse against all five children in the household, including J.T.T., then four months old, and J.A.T., then 14 months of age. Sh.M., age four years, four months, died *523 on August 22, 1976 as a result of the injuries sustained from the abuse.
All the children were removed from D.T. and J.T. and were placed in foster homes on August 24, 1976. J.A.T. and J.T.T. were placed in separate homes.
L.M. and S.M. were returned to their natural father and they reside with his parents in Florida.
D.T. and J.T. were indicted and tried for the murder of Sh. M.J.T. was found guilty of murder in the second degree and on September 15, 1977 sentenced to an indeterminate term not to exceed 30 years. He is presently in prison.
D.T. was convicted of aiding and abetting involuntary manslaughter and of child neglect of all five children. On July 20, 1978 she was sentenced to confinement for an indeterminate term not to exceed three years; the sentence of confinement was suspended and she was placed on probation for a period of five years.
The complaint in this action was filed December 13, 1978.
At this time D.T. resides with her parents. She works three days a week as a receptionist for a chiropractor and on weekends as a waitress. She attends high school at night and expects to graduate next school year. She also does volunteer work at a local hospital. Once a week she attends counseling sessions with a psychologist.
D.T. visits with J.A.T. and J.T.T. about twice a month at the office of DYFS.
D.T. and J.T. are still married to each other although she said she has filed for divorce.
J.T. has no interest in the children and has not seen them since August 1976.
J.A.T. has been residing with the same foster family since early September 1976. When she arrived she was malnourished, anemic, thin and pale in color; she had nightmares. She is now of normal weight, sleeps well, is happy and secure. She is affectionate with her foster parents.
*524 J.A.T. calls her foster parents "mommy" and "daddy." She refers to D.T., her natural mother, as "the lady" or "the lady with the long hair." No affection is shown on the visits.
Both parents expressed a desire to adopt J.A.T. if the parental relationship is terminated.
J.T.T. has been with his present foster parents since late August or early September 1976; he was then four months old. When he arrived he was undernourished. He is now in good health except that he may have a problem with one ear, and because of that there may be a learning disability. He is taken for speech therapy twice a week.
J.T.T. is affectionate to his foster family. He refers to the parents as "mommy" and "daddy."
J.T.T. is upset when he visits with D.T.; he cries and doesn't want to go. On return home he is upset, follows the foster mother around the house, and doesn't sleep well.
The foster family is the only family J.T.T. has ever known. The foster parents have expressed a desire to adopt J.T.T.
J.A.T. and J.T.T. know each other through their visits with D.T., but whether they understand a brother-sister relationship is speculative.
Prior to the taking of testimony on the merits, each pair of grandparents made application to intervene and to be considered as potential custodians for the children.
The grandparents misinterpret these proceedings as one for the custody of the children. It is not. This is an action to sever the legal relationship between the children and their parents. If the relationship is severed the children are placed under the guardianship of DYFS for all purposes, including the placement of the children for adoption, N.J.S.A. 30:4C-20. The parents, and the grandparents, are thus eliminated from consideration for custody of the children. "A grandparent's right to custody, or even to visitation, can rise no higher than those of the natural parents." J. & E. v. M. & F., 157 N.J. Super. 478, 494 *525 (App.Div. 1978). Grandparents have no recognized right to custody, short of an independent action for adoption. Ibid.
If the parental relationship is not terminated, DYFS would be obliged to work for an eventual return of the children to their natural parents. The declared public policy of the State is the preservation of family life, and giving each child outside the home the opportunity for an eventual return to the home of his or her natural parents. N.J.S.A. 30:4C-1(a) and (b); N.J.S.A. 30:4C-51.
In either event, the grandparents would not, for that relation alone, be entitled to custody of their grandchildren.
It should also be noted that the paternal grandparents have never seen the children. They have never applied to this court, or to any other court, to see the children or for their custody. Even on their application to intervene they have not asked for visitation.
The maternal grandmother accompanies D.T. when she visits the children. That is their only contact with the children.
To permit a party to intervene in an action is within the discretion of the trial court. R. 4:33-2. If the intervention would serve no useful purpose, it must be denied.
An action to terminate parental rights cannot be allowed to become a custody contest. No useful purpose would be served by allowing these grandparents  maternal and paternal  to intervene. Permission to intervene was therefore denied.
Subsequent to the taking of testimony and summation by counsel, but before decision was reached, the court received a letter from one of the foster parents. The foster parents had not previously testified in the action.
Foster parents stand on a different footing than grandparents. These are the families with whom the children reside, and these particular families had received the children only a short while after removal from the home of the natural parents.
*526 Foster parents have a right to be heard if they object to an administrative determination by DYFS to remove a foster child from their home. Doe v. State, 165 N.J. Super. 392, 404 (App.Div. 1979). Under the Child Placement Review Act, N.J.S.A. 30:4C-50 et seq., even if foster parents do not request a hearing concerning the placement of the foster child, the Juvenile and Domestic Relations Court may, on its own, conduct a hearing regarding the placement of a child and summon the foster parents to testify as to what may be in the best interests of the child. N.J.S.A. 30:4C-61. The trend appears to be that foster parents should have standing in court on matters affecting their foster children.
Where the court believes that anyone, including foster parents, has information which would be helpful in determining what is in the best interests of the children, that person or persons should be permitted to testify. The foster parents were therefore allowed to intervene and present testimony as to the best interests of the children.
A guardian ad litem for the children was appointed, R. 4:26-2(b)(4); his report was submitted to the court.
Guidelines for the severance of parental rights were set forth in J. & E. v. M. & E., supra, 157 N.J. Super. at 489-490. What is in the "best interests of the child" is of paramount concern. Psychological factors must be considered if mental injury would result on removal of the children from their present homes. Sorrentino v. Family & Children's Soc. of Elizabeth, 72 N.J. 127, 131 (1976); In re Adoption by A.M. & L.M., 170 N.J. Super. 320 at 332 (App.Div. 1979).
Testifying before the court in these proceedings were three psychiatrists. In addition, the court had the benefit of various psychological and psychiatric evaluations. All agreed there would be psychological harm to the children if they were to be removed from their present foster homes. One psychiatrist, Dr. Seymour F. Kuvin, stated the trauma on removal would be minimal, but psychotherapy would be necessary. Dr. *527 James J. Ferretti indicated removal of J.T.T. from his foster parents would be psychologically damaging, and removal of J.A.T. would have an extreme deleterious effect. The third psychiatrist, who examined only J.A.T., also indicated it would be detrimental to the girl if she were removed from her present home; the basic integrity of the child would be ruined.
All the doctors agreed that the foster parents have become the psychological parents. A "psychological parent" was aptly defined by Dr. Kuvin as one who loves, cares and nurtures the child on a day-to-day basis.
In effect, the psychological parent has become the actual parent. J.T.T. has known no other parents. J.A.T. was only about 14 months old when removed from her mother's home  how well can she remember her?
On analysis of all the evidence, and taking all factors into consideration, I am persuaded that the proofs are clear and convincing that it would be in the best interests of both children that the parental relationship between them and their natural parents be terminated.
Ordinarily the court's jurisdiction in this matter would cease upon entry of the order of termination. But pursuant to the Child Placement Review Act, supra, the court has continuing jurisdiction of children in placement, including those under the guardianship of DYFS. N.J.S.A. 30:4C-52(b). Jurisdiction continues until the children attain the age of 18, N.J.S.A. 30:4C-52(a), are returned home, or are established in "alternate permanent placement." N.J.S.A. 30:4C-53.
"Alternate permanent placement" is a home in substitute for a home with the natural parents when that home is no longer available. And it is the home where the child would reside until emancipated or beyond. It would be the home of adoptive parents were the child to be adopted.
Because it would be psychologically injurious to the children to be otherwise than where they are, the court, to insure that J.A.T. and J.T.T. remain in their present foster homes, will have *528 continuing supervision over them until adopted. N.J.S.A. 30:4C-53.
DYFS will file with the court a placement plan for each child in accordance with N.J.S.A. 30:4C-58.