NEW JERSEY DIVISION YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, C.D., INTERVENOR–APPELLANT, v. E.D., DEFENDANT–RESPONDENT, K.D., DEFENDANT–APPELLANT.

IN THE MATTER OF K.D., A MINOR.

Superior Court of New Jersey
Appellate Division

Argued May 8, 1989—Decided June 5, 1989.

402

Before Judges PETRELLA, SHEBELL and GRUCCIO.

*Richard J. Bennett* argued the cause for appellant C.D. (*Middlesex County Legal Services Corporation*, attorneys; *Michelle Joy Munsat*, of counsel and on the brief).

*Jon S. Pascale*, Designated Counsel, argued the cause for appellant K.D. (*Alfred A. Slocum*, Public Defender, attorney; *Jon S. Pascale*, of counsel and on the brief).

*Diane K. Reiter*, Deputy Attorney General, argued the cause for respondent Division of Youth and Family Services (*Peter N. Perretti, Jr.*, Attorney General, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Diane K. Reiter*, on the brief).

*Steven M. Gilson*, Designated Counsel, argued the cause for respondent E.D. (*Alfred A. Slocum*, Public Defender, attorney; *Steven M. Gilson*, of counsel and on the brief).

The opinion of the court was delivered by

SHEBELL, J.A.D.

K.D., the father of the infant K.D., and the infant's paternal grandmother, C.D., appeal from an order of the Family Part dated December 30, 1987, which was amended on February 10, 1988, to provide that, R.D. and N.D., the maternal uncle and aunt of the infant K.D., respectively, receive physical custody of appellant's infant son K.D., but that he remain in the legal custody of the New Jersey Division of Youth and Family Services (DYFS). The order under review denies K.D. and C.D.

visitation "in the best interest of the child," but grants E.D., the natural mother, limited visitation.

The infant K.D. was born July 5, 1986 to E.D. and K.D., who were not married. Soon after the infant's birth, DYFS was notified of the hospital's concern that the mother could not care for her child, as E.D. was homeless and had recently been discharged from a methadone maintenance program on suspicion of illegal drug use. The child was born drug addicted. DYFS established immediate supervision with the mother and infant. After several months the two moved to the mother's grandmother's home. The DYFS worker who visited the home noticed that E.D. frequently appeared to be under the influence of drugs.

During the fall of 1986, E.D. was incarcerated, and her grandmother cared for the infant. In November 1986, when the infant was hospitalized with bronchitis, his mother visited and began screaming in an hysterical and delusional manner, reportedly under the influence of drugs which she had taken in the hospital bathroom. Her counsel conceded that because of her addiction she was unable to care for the infant as of the time of the initial Family Part hearing. DYFS moved for an order giving it custody of the infant. DYFS was granted custody, and the infant was placed with foster parents.

The infant's mother informed the trial court that she wanted her brother and his wife, R.D. and N.D., to have custody of the infant. They live in South Carolina, but came to New Jersey for the hearing. At the time of the hearing, R.D. was finishing his last year of studies to be a doctor of chiropractic medicine. He and his wife stated that they wanted to obtain custody of the infant. R.D. maintained that he wanted the infant to have a "normal life," and that if the court granted visitation to either the infant's mother or father or any other paternal relatives, he would not comply with the court order. R.D. and N.D. have one child of their own. R.D. asserted that he and his wife intend to maintain custody of the infant K.D. for six months,

and then file for adoption pursuant to South Carolina law. A DYFS worker stated at trial that it was the intention of DYFS to maintain supervision of the child for six months, after which time the file would be closed and the South Carolina "sister" office would take control.

K.D., the infant's father, was present at the hearing but did not testify. Although he was then and continues to be an inmate in state prison, his attorney stated that it was his client's desire to maintain custody of the infant. Appellant C.D., the 74-year old paternal grandmother of the infant K.D., intervened in the Family Part action, requesting that she be granted custody of the infant. She and her daughter, D.D., live in a two bedroom apartment in New Brunswick. D.D. was 52-years old at the time of the hearing and worked two jobs; full-time as a university secretary, and part-time, some evenings and weekends, at a local toy store.

Under the trial court order, the infant has been living with the maternal uncle and aunt in South Carolina since January 1988. The order permits visitation by the mother E.D. one day per month.

Appellants contend that DYFS' plan to monitor the infant K.D. for six months and then to close the file amounts to termination of the rights of the infant's parents in violation of New Jersey law, as DYFS has been granted custody of the child on a temporary basis only and no proceeding to terminate the parents' rights has been instituted. The State submits that placement of the infant K.D. with its South Carolina relatives was in the best interest of the child, and that appellants' arguments are misplaced as the proceeding, as stated repeatedly during the course of trial, was only "for a determination as to with whom custody of the minor should be placed."

DYFS may place a child who is in its custody in the custody of a relative. *See N.J.S.A.* 9:6–8.54. There is no restriction that the child be placed only with relatives within the jurisdiction of this state. We must, however, be concerned with

whether the court's order, in granting legal custody of the infant to DYFS and physical custody to the maternal relatives in South Carolina, might act as a *de facto* termination of, or infringement upon, the parental rights of E.D. and K.D..

Therefore, we first examine whether the South Carolina courts would have jurisdiction over R.D. and N.D.'s proposed adoption of the infant. The Uniform Child Custody Jurisdiction Act (UCCJA) has been adopted by both New Jersey and South Carolina. *See N.J.S.A.* 2A:34-28 *et seq.; S.C.Code Ann.* § 20-7-782 *et seq.* (Law. Co-op 1976). The Parental Kidnapping Prevention Act of 1980 (PKPA) governs all states. 28 *U.S.C.A.* § 1738A (West Supp.1989). The UCCJA seeks to introduce certainty and stability in the choice of forum in interstate custody disputes and to encourage interstate cooperation in the interest of the child. *E.E.B. v. D.A.,* 89 *N.J.* 595, 603 (1982), *cert.* den. 459 *U.S.* 1210, 103 *S.Ct.* 1203, 75 *L.Ed.*2d 445, reh'g den. 460 *U.S.* 1104, 103 *S.Ct.* 1806, 76 *L.Ed.*2d 369 (1983). "While UCCJA focuses on custody disputes between family members, its operative provisions are broad enough to include a dispute between a natural parent and adoptive parents." *Id.* at 607. While one of the purposes of PKPA is to deter interstate abduction of children by contesting parents in custody disputes, it applies as well "to disputes between all persons who seek custody of a child." *Id.* at 603 citing *Pub.L. No.* 96-611, § 7, 94 Stat. 3568.

The adoption of the infant K.D. by his maternal uncle and aunt would constitute a modification of the February 10, 1988 order that the infant "shall remain in the legal custody of the New Jersey Division of Youth and Family Services, with physical custody of the minor being placed with the maternal uncle and aunt, [R.D. and N.D.], in South Carolina...." Both PKPA and UCCJA prohibit modification of a child custody order unless the revising forum has jurisdiction, and the state that rendered the original order has lost jurisdiction or has declined to exercise it. *E.E.B.,* 89 *N.J.* at 611; *compare* 28 *U.S.C.A.* § 1738A(f) (West Supp.1989) with *N.J.S.A.* 2A:34-42a. Two or

more states cannot have concurrent jurisdiction to modify a court order under UCCJA. *Neger v. Neger,* 93 *N.J.* 15, 29 (1983). *But see Bowden v. Bowden,* 182 *N.J. Super.* 307, 313–14 (App.Div.1982).

South Carolina would have jurisdiction over the infant K.D. as the UCCJA provides that a state has jurisdiction over a child if it is the child's home state. *S.C.Code Ann.* § 20–7–788(a)(1)(i) (Law. Co-op 1976); *N.J.S.A.* 2A:34–31a(1)(i). Jurisdiction in South Carolina is reinforced by reason of the fact that "the child and at least one contestant [the maternal uncle and aunt], have a significant connection with [South Carolina] and ... there is available in [South Carolina] substantial evidence concerning the child's present or future care, protection, training and personal relationships...." *S.C.Code Ann.* § 20–7–788(a)(2) (Law. Co–op 1976); *N.J.S.A.* 2A:34–31a(2). Nonetheless, the order under review may be modified by South Carolina only if its courts determine that New Jersey has lost jurisdiction or has declined to exercise it. *See E.E.B.,* 89 *N.J.* at 611.

The New Jersey courts have placed the infant in the physical custody of his maternal uncle and aunt after being told that it is their intention to adopt the child in South Carolina after six months' time has elapsed, and that New Jersey DYFS intends to close the case file on the child after a six-month period. There is a distinct possibility under these circumstances that South Carolina courts would feel confident that New Jersey had relinquished jurisdiction of the child, and therefore feel free to amend the trial court's order and permit the adoption of the infant by residents of South Carolina.

We cannot agree with the contention of DYFS that in a South Carolina proceeding E.D. and K.D. are guaranteed the same protections they are entitled to in New Jersey against termination of their parental rights. If the maternal aunt and uncle move to adopt the infant in South Carolina, the child's parents,

to effectively defend against the action, would be required to go to that state.

Pursuant to South Carolina law, prior to adoption of a child, consent or relinquishment of parental rights is required of

the father of a child born when the father was not married to the child's mother, if the child was placed with the prospective adoptive parents more than six months after the child's birth, but only if the father has maintained substantial and continuous or repeated contact with the child as demonstrated by:

(a) payment by the father toward the support of the child of a fair and reasonable sum, based on the father's financial ability; and either

(b) visits by the father to the child at least monthly when the father is physically and financially able to do so, and when the father is not prevented from doing so by the person or agency having lawful custody of the child; or

(c) regular communication by the father with the child or with the person or agency having lawful custody of the child, when the father is physically and financially unable to visit the child, or when the father is prevented from visiting the child by the person or agency having lawful custody of the child.

The subjective intent of the father, if unsupported by evidence of the acts specified in subitems (a), (b), and (c) of this item (4) of subsection (A) of this section, does not preclude a determination that the father failed to maintain substantial and continuous or repeated contact with the child. In making this determination, the court may not require a showing of diligent efforts by any person or agency having lawful custody of the child to encourage the father to perform the acts. [*S.C.Code Ann.* § 20–7–1690(A)(4) (Law. Co-op 1976)].

Thus, in South Carolina it is legally permissible to adopt a child even if no consent has been given by a natural father, whose rights have not been terminated. "[T]he mother of a child born when the mother was not married," however, absent the termination of her parental rights, must give her consent or relinquish her parental rights prior to the adoption of that child. *S.C.Code Ann.* § 20–7–1690(A)(3) (Law. Co-op 1976).

In New Jersey, without a valid termination of parental rights, there can be no adoption of the child. *Matter of Baby M,* 109 *N.J.* 396, 428 (1988), citing *In re Adoption of Children by D.,* 61 *N.J.* 89, 95 (1972); *see In re Adoption of Two Children by A.M. and L.M.,* 170 *N.J. Super.* 320, 328 (App.Div.1979). Placement of a child with foster parents does not give the foster parents the right to adopt the children entrusted to them. *A.M.*

*and L.M.*, 170 *N.J.Super.* at 328. "The mere conclusion by DYFS that parental rights ought to be terminated does not *per se* entitle it to authorize or approve the institution of adoption proceedings by the foster parents." *Id.* at 330. We find no discernible difference in the dangers to be guarded against between adopting a child prior to a valid termination of parental rights and permitting adoption of a child, albeit in a different state, with no proceeding to terminate the rights of both parents, as could result in the present case.

In both New Jersey and in South Carolina the father of the child must receive notice of the adoption proceedings, even if in South Carolina he has been adjudged to have "abandoned" the child pursuant to *S.C.Code Ann.* § 20–7–1690(A)(4) (Law. Co-op 1976). *See S.C.Code Ann.* § 20–7–1734(B) (Law. Co-op 1976); *N.J.S.A.* 9:3–45. However, even if a South Carolina court were to determine that termination of the father's parental rights was required, the father would not have an automatic right to counsel in the termination proceedings. *S.C.Code Ann.* § 20–7–1570 (Law. Co-op 1976) provides, in relevant part, "[i]f the parent is not represented by counsel [in a termination proceeding], the judge shall make a determination on a case by case basis whether counsel is required." In New Jersey counsel must be provided "without cost to indigent parents who are subjected to proceedings which may result in either temporary loss of custody or permanent termination of their parental rights. Simple justice demands nothing less in light of the magnitude of the consequences involved." *Crist v. N.J. Div. Youth & Family Services*, 135 *N.J.Super.* 573, 575 (App.Div. 1975).

We find that important differences exist in the approach of the two states in the area of the adoption of children. South Carolina permits the adoption of a child without a separate termination of the rights of the unwed father. New Jersey requires that the parents' rights be terminated in order for adoption to be effected. New Jersey requires that counsel be provided the parents for the termination proceedings, while

South Carolina does not. Allowing the child to be adopted in South Carolina without guaranteeing that termination of the rights of the New Jersey parents will be during a proceeding where the parents are afforded substantially the same rights they would have in this State offends the strong public policy of New Jersey. *See Matter of Baby M*, 109 *N.J.* at 428. Since South Carolina does not provide the procedural protections that are available in New Jersey, such as the necessity for termination of the father's rights prior to adoption of the child by third parties, and the guarantee of counsel in all cases, New Jersey should retain jurisdiction of any proceeding to terminate parental rights so long as the parents remain in New Jersey. The order of the Family Part must be amended to insure that the intention of the New Jersey courts to retain jurisdiction is made clear.

We need not determine whether the New Jersey statutory criteria under *N.J.S.A.* 30:4C–15, regarding termination of parental rights, has been met in the present case. No mention was made at the hearing below of terminating the parental rights of E.D. or K.D.. It was stated that the purpose of the hearing was not to terminate parental rights. *See N.J.S.A.* 30:4C–17; 30:4C–20. As stated by the trial judge on C.D.'s motion for reconsideration, "the entire proceeding was a custody proceeding and I concerned myself with the custody aspects and what is for the best interest of the child."

Nor should we involve ourselves in such a determination at this time. " 'The warmth and complexity of such relationships should not be assessed against the typed words of a cold record.' " *New Jersey Div. of Youth and Family Services v. A.W.*, 103 *N.J.* 591, 617 (1986), quoting *In re Michael B.*, 58 *N.Y.*2d 71, 75, 459 *N.Y.S.*2d 254, 256, 445 *N.E.*2d 637, 639 (Cooke, C.J., concurring), reargument den. 58 *N.Y.*2d 1114, 462 *N.Y.S.*2d 1029, 449 *N.E.*2d 746 (1983). A factually sensitive issue, such as termination of parental rights, which was not addressed at trial, should not be determined *de novo* by an appellate court. *See Matter of Baby M*, 109 *N.J.* at 463.

Appellant C.D. cites *N.J.S.A.* 10:5–3 in support of her contention that the trial court impermissibly considered her age of 74 years in determining the custody of the infant K.D.. This statute declares, in relevant part,

[t]he Legislature finds and declares that practices of discrimination against any of its inhabitants, because of race, creed, color, national origin, ancestry, age, sex, marital status, liability for service in the Armed Forces of the United States, or nationality, are a matter of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State....

We have previously considered the significance of the age of an applicant for custody of a child. *See J. and E. v. M. and F.,* 157 *N.J.Super.* 478, 494 (App.Div.), certif. den. 77 *N.J.* 490 (1978). The trial court's denial of C.D.'s motion for custody of the infant here was not "made solely on the basis of her age," as she contends. The trial judge stated in his opinion,

[C.D]. is seventy-four years old. Her health is not that good. In fact, she testified to a heart condition. Her testimony also indicated to me that she is a dedicated mother who would accept her son, [K.D.], back into her home upon his release from prison. Her dedication as a mother and her ability to forgive her son are admirable qualities indeed. However, by minimizing her son's drug activities, and in view of her age and health, it is my conclusion that she would not be able to ensure the safety and physical and moral welfare of the infant. It is for these reasons that I cannot grant custody of the infant to [C.D.].

Therefore, it is not necessary to determine her contention that "age, alone, is not appropriately to be considered as a disqualifying factor in determinations of foster care placement."

■ C.D. also contends that the findings of the trial judge are not founded upon sufficient credible evidence in the record. A trial court's determination regarding custody should be affirmed if

the findings made could reasonably have been reached on sufficient credible evidence present in the record. When the reviewing court is satisfied that the findings and result meet this criterion, its task is complete and it should not disturb the result, even though it has the feeling it might have reached a different conclusion were it the trial tribunal. [*Beck v. Beck,* 86 *N.J.* 480, 496 (1981), quoting *State v. Johnson,* 42 *N.J.* 146, 161–62 (1964)].

*See also Matter of Baby M,* 109 *N.J.* at 457. "In considering all the circumstances upon which the child's best interests hinge, a

trial court judge has the opportunity to become fully immersed in the details of the case, and his opinion will be given great weight on appeal." *Palermo v. Palermo,* 164 *N.J.Super.* 492, 498 (App.Div.1978). The trial court's determination that C.D. should not be granted custody of her grandchild, on the basis of her age, her health and because she would not keep her son K.D. from the child if granted custody was reasonably made on sufficient credible evidence in the record and may not be disturbed.

C.D. argues that whether she would allow her son back into her household after his release from prison is not relevant "as any determination of the father's ability to have contact with his son when he is released from prison must be made at a later date, and is thus not a proper consideration in determining whether C.D. should be granted temporary custody at this time." While *N.J.S.A.* 30:4C–12 contemplates a temporary separation of a child from his natural parents, the 6–month limitation upon the duration of the custody order may be extended. *See A.M. and L.M.,* 170 *N.J.Super.* at 328. The foster care of the infant K.D. has been of an extended nature. His father is incarcerated as a repeat drug offender and is a drug abuser. His mother is unable to care for him due to her drug addiction. K.D. was denied visitation with his infant son by the trial court, a determination that was not appealed. The issue of whether C.D. would be able to keep her son K.D. from her apartment if she had custody of the infant K.D. was thus relevant to the court's inquiry.

C.D. also complains that various areas of cross-examination were erroneously denied her by the trial judge. This contention is clearly without merit. *R.* 2:11–3(e)(1)(E).

C.D., K.D. and E.D. assert that the trial court's admission of the home evaluation of the maternal uncle and aunt, prepared by the Spartanburg County Department of Social Services in South Carolina, constituted reversible error. The trial court admitted the South Carolina home evaluation

through a New Jersey DYFS worker under *Evid.R.* 63(15) which provides, in relevant part,

a statement is admissible if in the form of ... a written statement of an act done, or an act, condition or event observed by a public official if it was within the scope of his duty either to perform the act reported or to observe the act, condition or event reported and to make the written statement....

A public official of a state or territory of the United States is defined in *Evid.R.* 62(3) as including "an official of a political subdivision or regional or other agency of [a] state or territory and of a municipality." However, the scope of the materials allowed under *Evid.R.* 63(15) is too narrow to permit the admission of the entire report prepared by the Spartanburg County agency.

DYFS reports have previously been admitted pursuant to *Evid.R.* 63(13). *See In re Cope,* 106 *N.J.Super.* 336, 343 (App.Div.1969); *R.* 5:12–4(d). In order for a report to be admissible under *Evid.R.* 63(13),

[f]irst, the writing must be made in the regular course of business. Second, it must be prepared within a short time of the act, condition or event being described. Finally, the source of the information and the method and circumstances of the preparation of the writing must justify allowing it into evidence. [*State v. Matulewicz,* 101 *N.J.* 27, 29 (1985), citing *State v. Hudes,* 128 *N.J.Super.* 589, 594 (Cty.Ct.1974)].

As the South Carolina social services worker did not testify at the hearing, and thus no information was available concerning the preparation of the report, there was insufficient foundation for its admission under *Evid.R.* 63(13). But, compare *W.W. v. I.M.,* 231 *N.J.Super.* 495, 502–04 (App.Div.1989), where reports of the Children's Psychiatric Center (CPC) were held admissible in a custody proceeding as DYFS reports, pursuant to *R.* 5:12–4(d), *N.J.S.A.* 9:6–8.46, and *N.J.S.A.* 9:6–8.10a. However, the majority in *W.W.* did not address the issue of whether there was proper foundation for the admission of the reports, but only whether the reports should be admissible in a proceeding instituted not by DYFS but by a private party. *Id.* at 504. *R.* 5:12–4(d) provides that "[t]he Division of Youth and Family Services shall be permitted to submit into evidence, pursuant to Evidence Rules 63(13) and 62(5), reports by staff personnel or

professional consultants. Conclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal."

*N.J.S.A.* 9:6–8.46 provides, in relevant part,

[i]n any hearing under this act ... any writing, record or photograph, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency shall be admissible in evidence in proof of that condition, act, transaction, occurrence or event, if the judge finds that it was made in the regular course of the business of any hospital or any other public or private institution or agency, and that it was in the regular course of such business to make it, at the time of the condition, act, transaction, occurrence or event, or within a reasonable time thereafter, shall be prima facie evidence of the facts contained in such certification. A certification by someone other than the head of the hospital or agency shall be accompanied by a photocopy of a delegation of authority signed by both the head of the hospital or agency and by such other employees. All other circumstances of the making of the memorandum, record or photograph, including lack of personal knowledge of the making, may be proved to affect its weight, but they shall not affect its admissibility....

In the present case, as no evidence was presented that the South Carolina report was prepared in the regular course of business, it is not admissible pursuant to *N.J.S.A.* 9:6–8.46. In addition, it is questionable whether an examination of a prospective custodial parent's home in another state is within the scope intended by the statutory reference to "any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding...." *N.J.S.A.* 9:6–8.46.

Finally, *N.J.S.A.* 9:6–8.10a(b)(6) provides that all information obtained by DYFS in investigating reports of child abuse shall be kept confidential, but may be released to "[a] court, upon its finding that access to such records may be necessary for determination of an issue before the court...." As noted by the dissent in *W.W.*, however, this provision "does not deal with the admissibility of evidence at a trial. Rather, it provides an exception to the general rule established by *N.J.S.A.* 9:6–8.10a of confidentiality of DYFS records and reports." *Id.* at 524 (Skillman, J.A.D., dissenting).

■ Improper admission of evidence does not automatically mandate reversal. At the hearing for appellant C.D.'s motion for a stay of the order, the trial judge stated regarding the South Carolina home study of the maternal uncle and aunt:

That was only a very minor factor. The most important thing that convinced me was the testimony of these people coming up here from South Carolina. That is—maybe I should have been more explicit in my opinion, however, the fact that they came up here from South Carolina, the fact that they wanted this child, the fact that as I stated before the aunt saying I will take him regardless of if he has AIDS or not, having a child of her own. The fact that [E.D.] tells—told me under oath that I want my child to have a chance, give him to my brother. Those are things that entered into the Court's—of course, the fact that there was a home study done in South Carolina was significant, wasn't as significant as the testimony was for the best interest of the child, counselor.

As the trial court relied mainly on the testimony presented below and not the home report, and as the parties had the ability to directly interrogate the relatives concerning the home in South Carolina, reversal on this ground is not warranted. *See In re Hoffman,* 53 *N.J.Super.* 396, 401–02 (App.Div.1959); *see also Armstrong v. Francis Corp.,* 20 *N.J.* 320, 325 (1956).

■ C.D. urges that, if she is denied custody, this court "should reverse the decision of the trial judge regarding visitation and exercise its authority of original jurisdiction to grant her liberal visitation." DYFS contends that the decision of the trial court to deny C.D. visitation with the infant K.D. was not in error, "as there has been minimal contact between the paternal grandmother and the minor, there is no meaningful relationship between them, and any visitation will cause disruption to the family unit in South Carolina where the minor now lives."

Our Supreme Court stated in *Mimkon v. Ford,* 66 *N.J.* 426, 437 (1975):

It is biological fact that grandparents are bound to their grandchildren by the unbreakable links of heredity. It is common human experience that the concern and interest grandparents take in the welfare of their grandchildren far exceeds anything explicable in purely biological terms. A very special relationship often arises and continues between grandparents and grandchildren. The tensions and conflicts which commonly mar relations between parents and children are often absent between those very same parents and their grandchil-

dren. Visits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship. Neither the Legislature nor this Court is blind to human truths which grandparents and grandchildren have always known.

At common law a grandparent's right to visitation could rise no higher than that of the natural parent. *J. and E. v. M. and F.*, 157 *N.J.Super.* at 494; *D.Y.F.S. v. D.T. and J.T.*, 171 *N.J.Super.* 520, 524 (Cty.Ct.1979). However, *N.J.S.A.* 9:2–7.1 provides:

Where either or both of the parents of a minor child, residing within the State, is or are deceased, or divorced or living separate and apart in different habitats, regardless of the existence of a court order or agreement, a grandparent or the grandparents of such child, who is or are the parents of such deceased, separated or divorced parent or parents, or any sibling of the child may apply to the Superior Court, in accordance with the Rules of Court, to have such child brought before such court; and the court may make such order or judgment, as the best interest of the child may require, for visitation rights for such grandparent, grandparents or sibling in respect to such child.

Thus, contrary to common law principles, under *N.J.S.A.* 9:2–7.1, "[w]here grandparents have a direct, personal relationship with the grandchild, their rights are found independent of the parents' rights." *Youth & Family Services Div. v. Torres*, 185 *N.J.Super.* 234, 246–47 (Cty.Ct.1980), aff'd 185 *N.J.Super.* 182 (App.Div.1982). *N.J.S.A.* 9:2–7.1 "creates a presumption that the best interests of the child ordinarily are served by maintaining their contact and communication with their grandparents." *Globman v. Globman*, 158 *N.J.Super.* 338, 345–46 (App.Div.), certif. den. 77 *N.J.* 493 (1978).

Prior to DYFS' grant of custody of the infant K.D., from July to December 1986, C.D. had cared for her grandchild four or five times, for several days at a time. Although she was permitted by DYFS to see her grandchild only once per month for one hour each visit, the trial court denied her visitation in December 1987, and she thus has not seen her grandchild for approximately 16 months.

Our Supreme Court in *Matter of Baby M* stated,

> [w]e disagree with the premise, however, that in determining custody a court should decide what the child's best interests *would be* if some hypothetical state of facts had existed. Rather, we must look to what those best interests *are, today,* even if some of the facts may have resulted in part from legal error. The child's interests come first: we will not punish it for judicial errors, assuming any were made. (Citation omitted). [109 *N.J.* at 456; emphasis in original].

Clearly C.D. does not presently have a direct, personal relationship with the child. Our review should not be broadened to consider whether she would have had such a relationship if she had been granted more liberal visitation by DYFS, and/or visitation by the trial court. *See ibid.*.

C.D.'s lack of a "direct, personal relationship" with her grandchild, regardless of the reason, gives rise to no independent right to visitation. *See Torres,* 185 *N.J.Super.* at 246–47. The finding of the trial court that visitations should be denied "could reasonably have been reached on sufficient credible evidence present in the record," *Matter of Baby M,* 109 *N.J.* at 457, quoting *Beck,* 86 *N.J.* at 496, and is affirmed.

We affirm and remand for the entry of an order by the Family Part which will make it clear that New Jersey is retaining jurisdiction of the case.