588 A.2d 842
STATE OF NEW JERSEY, IN THE INTEREST
OF J.D., A MINOR.

Superior Court of New Jersey
Appellate Division

Argued February 11, 1991—Decided March 25, 1991.

Before Judges DREIER and ASHBEY.

*Sheila Crotty,* Deputy Attorney General, argued the cause for appellant (*Robert J. Del Tufo,* Attorney General, attorney; *Andrew M. Silkowitz,* Assistant Attorney General, of counsel; *Bertram P. Goltz, Jr.* and *Sheila Crotty,* on the brief).

*Ralph A. Colasanti* argued the cause for respondent (*Ralph A. Colasanti,* on the brief).

The opinion of the court was delivered by

ASHBEY, J.A.D

The Division of Youth and Family Services (DYFS) appeals from a Family Part May 25, 1990 court order involving the alleged delinquent J.D. and the family of P.S., a DYFS foster mother.[1] J.D. was under the custody of DYFS and had been placed with the P.S. family, apparently with a view toward adoption. P.S. prompted the police to sign a delinquency complaint against J.D., alleging that J.D., along with another foster child, had sexually abused her neurologically impaired natural son and a foster son. On February 2, 1990, there was a detention hearing. The court ordered DYFS to investigate the D.D. family, where DYFS proposed to place J.D., based upon Mr. D.D.'s representation in court that J.D. was a friend of his companion's son and welcome in their home. After that hearing, P.S. brought an order to show cause to restrain DYFS from placing J.D. at the D.D. household because of its location, a short distance from her home.

---

[1] While the record on appeal did not contain the relevant delinquency petitions, we requested them. Following oral argument we received one petition which charged J.D. with aggravated sexual assault by anal and oral penetration.

On March 7, 1990, the court heard the matter and ordered DYFS not to place J.D. within ten miles of P.S.'s home, as P.S. requested. DYFS sought to vacate that order and P.S. moved to make the restraining order permanent resulting in a March 9 and March 30, 1990 hearing. On May 25, 1990, the judge modified the order, restraining J.D. and DYFS as follows:

ORDERED, that the Division of Youth and Family Services is hereby restrained from placing the said [J.D.], a minor, in a foster home within three (3) miles of the home of [P.S.] ...

FURTHER ORDERED, that the said [J.D.], a minor, is hereby restrained from interfering with [J.M.S.], a minor, and shall not present himself within three (3) miles of ... the [P.S.] residence.

And it being further ORDERED that this matter shall be scheduled for review one (1) year from the date of this Order to determine whether or not the said restraints shall continue.

That order accorded with the judge's March 9th and March 30th oral opinions. On March 30th, the judge said his order was based upon J.D.'s guilty plea to the sexual offense and DYFS' conduct in this case as an admission on their part that the child acted in an offensive way, criminally or not, sexually towards [P.S.'s] nine year old son.

Neither statement, however, concerning J.D.'s plea of guilt nor DYFS' admission of J.D.'s guilt, is supported in the record. On March 9, 1990, J.D. was represented by the Public Defender who requested that the delinquency matter be heard within two weeks. Yet on March 30, 1990, the judge said that J.D. had pleaded guilty on February 16, 1990. Although not provided to us, we requested and received a copy of that February 16, 1990 order which places the delinquency complaint on an inactive list for one year on conditions. No counsel is recorded as appearing for J.D. There is no evidence that a plea was taken.

According to respondent's brief, the evidence that J.D. committed any offense was that the other foster child in the P.S. household (who had been charged by P.S.) said so. According to respondent's certification before the trial court, P.S.'s natural son told her that another child had admitted sexual abuse on a third child, and "[h]e [the admitted abuser] had also indicated [to P.S.'s son] that [J.D.] had also sexually abused [two children]."

J.D. is reported as steadfastly denying any wrong conduct. On March 9, when the judge changed the restraints from a ten-mile radius of the P.S. home to a three-mile radius, the judge specifically rejected an attempt by the proposed foster father, Mr. D.D., to speak about whether J.D. was guilty. The judge also forbade Mr. D.D. from entertaining J.D. in his home for any occasion.

Based on this record, DYFS first contends that there was no jurisdictional basis for an order infringing on J.D.'s right not to have his movements restricted. Respondent urges one potential jurisdictional basis for such a Family Part order in the juvenile-family crisis section of *N.J.S.A.* 2A:4A–24a:

> Upon the determination that a juvenile has committed an act of delinquency or that a juvenile-family crisis exists, the court may impose such disposition or dispositions over those persons subject to its jurisdiction consistent with the purposes of this act.
>
> Such jurisdiction shall extend in these matters over a juvenile and his ... guardian ... found by the court to be contributing to a juvenile-family crisis.

A juvenile-family crisis is statutorily defined to be "behavior ... of a juvenile ... which presents or results in ... a serious threat to the well-being and physical safety of a juvenile...." *N.J.S.A.* 2A:4A–22g.

We agree with respondent that, had the judge found from a hearing that J.D. was a threat to J.S. and that DYFS as his guardian was contributing to the crisis, the court arguably had the power to enter any disposition permissible in a juvenile-family crisis. There is no doubt that one such disposition included placement in the care of DYFS to provide J.D. with services "in or out of the home," in accord with a DYFS service plan, which DYFS had the duty to present to the court within 30 days. Such a plan, however, must be presumed valid, "and had to be developed within the limits of ... [DYFS'] resources available." *N.J.S.A.* 2A:4A–43b(5). That disposition was also available following an adjudication that J.D. was a delinquent. As we have noted, however, there was no hearing on either ground.

Another source of jurisdiction over J.D. stemmed from the power of the court to detain him or to set conditions upon his release pending a hearing on the delinquency charge. *See N.J.S.A.* 2A:4A-38d. However, upon any detention, an adjudicatory hearing was required to be held within 30 days. *N.J. S.A.* 2A:4A-38k. While J.D. was not detained in a detention facility, we know of no jurisdiction permitting the court to establish significant pretrial restraints without setting any hearing on the delinquency charges. In our view, setting a hearing in one year was the equivalent of not setting a hearing at all.

We note that J.D. was first represented and then unrepresented by his public defender. It is axiomatic that J.D. was entitled to be represented by counsel "at every critical stage in the proceeding [potentially leading to] institutional commitment," *N.J.S.A.* 2A:4A-39a, and to the extent that informal dispositions restrain liberty, they cannot be made the subject of institutionalization if violated. In one hearing, J.D.'s public defender argued that J.D. should be restrained from contact with the P.S. family as a condition of freedom from detention, while clearly seeking to have the child placed with the one person who sought to be his foster parent, Mr. D.D. The judge rejected this approach. Ironically, the result was a coercive and restrictive order unfettered by the time restraints which would have been required concerning a condition of release pending trial. At the beginning, the judge said several times that J.D. could not be held to the terms of his restrictive order. Later he said that J.D. would "not be tolerated within 3 miles of the [P.S. home]," and finally, "I'm saying that [J.D.] is not to go within three miles of the [P.S.] house." The order reflected a coercive limitation on J.D.

At oral argument before us, respondent urged that J.D was at all times represented by a public defender, who chose not to attend some of the hearings. While it would appear that, on March 9, 1990, J.D.'s counsel did the best he could, the result when viewed from the perspective of J.D.'s fundamental rights

is questionable. *See In re Gault,* 387 *U.S.* 1, 41, 87 *S.Ct.* 1428, 1451, 18 *L.Ed.*2d 527, 554 (1967).

We have noted the February 16, 1990 order. Both on March 9, 1990 and March 30, 1990, the judge spoke of the matter being on an "inactive list." From the reference to J.D. having entered a guilty plea, the judge must have been referring to a one-year continuance following an adjudication of delinquency. *See N.J.S.A.* 2A:4A–43b(1). If so, as we have noted, there is no record of adjudication. Absent a factual basis for a plea, of course, there also could be no adjudication. *State in the Interest of J.R.,* 244 *N.J.Super.* 630, 637–638, 583 *A.*2d 376 (App.Div.1990). Absent an adjudication, there also could be no continuance. Adjourning the formal entry of a delinquency disposition for one year in order to give time for a juvenile to make a satisfactory adjustment, is not comparable to the adult pretrial intervention, a diversion program (unlike a pre-trial referral of a juvenile complaint to a juvenile conference committee, or for informal adjustment). *See R.* 3:28 *N.J.S.A.* 2C:43–12 *et seq.*

It is arguable that J.D. and DYFS were restrained as a matter of general equity, as litigants in a noncriminal matter. In fact, the judge appeared to indicate as much. If so, *R.* 4:52–1(a) provides:

[A temporary restraining] order may further provide for the continuation of the restraint until the further order of the court and shall be returnable within such time after its entry as the court fixes *but not exceeding 20 days* after the date of its issuance in the case of a resident defendant or 35 days in the case of a non-resident defendant, *unless within such time the court on good cause shown extends the time for a like period* or unless the defendant consents to an extension for a longer period. [Emphasis added.]

No future hearing was provided for within those time limits. The judge said that the "time is at least for one year renewable on February 16, 1991 and longer if it's seen that the danger or the anxiety still has cause to remain...." J.D., however, was not even a party to a separate equity proceeding. He was there as a person charged with delinquency. Since we can find no

relevant statute or rule authorizing the court to restrain J.D. at all, we need not review the extent of the restraints imposed.

In contrast, we are satisfied that DYFS conceded at the March 30 hearing that the court could issue reasonable restraints on its placement of J.D.[2] Moreover, the court did have jurisdiction over DYFS. While DYFS is the agency empowered to "[e]xercise general supervision over children for whom care, custody or guardianship is [statutorily] provided," *see N.J.S.A. 30:4C–4 et seq.*, we have held that the legislature, through the Child Placement Review Act, has retained jurisdiction in the court to review DYFS out-of-home placements. *N.J.S.A.* 30:4C–61.1(g).

> [W]here, as here, an action is commenced pursuant to *N.J.S.A.* 30:4C–12 [for custody based on parental unfitness] the court's jurisdiction continues until the court is notified that the child is returned home or that an alternative permanent placement has been made. *See State in re T.G.*, 173 *N.J.Super.* 146, 148–149 [413 *A.2d* 645] (J. & D.R.Ct.1980); *D.Y.F.S. v. D.T. & J.T.*, 171 *N.J.Super.* 520, 527 [410 *A.2d* 79] (J. & D.R.Ct.1979).

. . . .

> Since the court must determine whether the permanent placement plan submitted by DYFS is in the best interests of each of these children (*N.J.S.A.* 30:4C–61), the trial judge had the authority to include in its order granting DYFS guardianship a directive indicating the type of placement plan which he would consider to be in the children's best interests.

*In re C.W., M.W. and N.F. Guardianship*, 183 *N.J.Super.* 47, 53–54, 443 *A.2d* 231 (App.Div.1982).

Moreover, DYFS conceded at oral argument before us that a properly informed court had the authority to restrain DYFS from placing J.D. in a particular home, such as that of D.D. We focus, therefore, on whether the order as to DYFS was

---

[2]By conceding the appropriateness of some restraint, DYFS appears to avoid any separation-of-powers question, *see Div. of Youth & Family Services v. D.C.*, 118 *N.J.* 388, 398, 571 *A.2d* 1295 (1990); *see State In Interest of D.F.*, 145 *N.J.Super.* 381, 389–390, 367 *A.2d* 1198 (App.Div.1976), *certif. denied* 74 *N.J.* 260, 377 *A.2d* 665 (1977).

informed, noting that such an order must be based on J.D.'s best interest. *Ibid.*

DYFS urges that the order should have taken into account, not only reasonable terms to prevent contact between the former foster family and J.D., but also that DYFS did not have a home for J.D. other than the D.D. home.[3] When approached with this information, the court's instruction to DYFS was to, "keep looking. The one that's within a mile isn't satisfactory." While DYFS had a duty to find a suitable home, we agree with DYFS that the focus of the court's inquiry was not on J.D.'s best interests. Moreover, DYFS's representation concerning its lack of resources accords with the undisputed fact that J.D.'s ultimate foster home was found by the D.D. family, not DYFS. Certainly, the court's rejection of the D.D. home, saying, "What kind of wonderful influence was [D.D] that all this [sexual abuse] took place under his influence?" was entirely unsupported.

In any event, whether DYFS could have been ordered not to consider the D.D. home based on J.D.'s best interests is not before us because that was not the order sought or entered. We also need not determine if an order restricting DYFS to foster homes within a certain radius in order to keep a juvenile away from a particular family would always exceed the court's jurisdiction. We have already noted the Rule concerning the permissible length of temporary restraints. Above all the court's order was unsupported by any articulated relationship between the time and space restraints selected and the harm to be avoided, further contact between J.D. and J.S.

DYFS agreed to an order which restricted contact between J.D. and J.S. and an order which limited DYFS from permitting J.D.'s presence in an area closer to the P.S. family than the D.D. house. After the order appealed from, J.D. had been

---

[3]The D.D. family was not a regular foster family, but a specific volunteer for J.D.

placed with friends of the D.D. family in another community. At oral argument before us, DYFS represented that it had no intention of changing that placement. It seeks on J.D.'s behalf to remove the three-mile restraint so that J.D. may visit the D.D. family in the company of his present foster family. On rehearing such an order may be appropriately entered as it relates to DYFS. We continue to observe, however, that no order may be entered restricting J.D.'s movements, absent a factfinding to justify restraints at which J.D. must be separately represented by counsel so long as such an order is expected to have coercive effect. Moreover, some disposition, consistent with due process, must be made of any pending delinquency complaints.

The order appealed from is reversed.