IN THE MATTER OF THE ADOPTION OF CHILDREN BY D.

Argued January 10, 1972—Decided July 6, 1972.

*Mr. Robert Greenberg* argued the cause for defendant-appellant (*Messrs. Greenberg & Feiner,* attorneys).

*Mr. Albert L. Cohen* argued the cause for plaintiff-respondent (*Messrs. Cohen & Meshulam,* attorneys; *Mr. Alan R. Lebowitz,* of counsel).

PER CURIAM. In this contested adoption case, the County Court allowed plaintiff D to adopt two children, a girl aged seven and a boy aged six, born to his present wife and defendant U during their marriage, and to change their surnames to his. The Appellate Division affirmed the judgment, one judge dissenting. The opinions are unreported. U's appeal to this court is here as of right by reason of the dissent. *R.* 2:2–1(a)(2). All effect of the judgment has been stayed pending the outcome of the appellate process.

Involved is the not uncommon situation, but one which has had very little appellate consideration in this state, of children born to parents later divorced, custody in the natural mother, remarriage of the mother, and an application by her new husband to adopt the children, with the mother's consent but objected to by the natural father. This is obviously not a case where a child is "placed for adoption" by a natural parent in the usual sense of that phrase. Nor does it involve the physical custody of the children; the father does not seek it and is content that they continue to live with their mother and stepfather. It is to be stressed that what we have to say relates principally to a divorced parents situation.

Before dealing with the facts of this case, we ought to delineate the applicable law. Our current adoption statute, *N. J. S. A.* 9:3–17 to 36, *L.* 1953, *c.* 264, p. 1768, as amended, is a complicated enactment and, being primarily geared to the requirements and procedure for adoption by persons other than relatives of children "placed for adoption," is not entirely clear in setting forth the requisite procedures and standards in the divorced parents situation. Judicial construction is therefore required.

Two fundamental matters are plain. The first, contained in the statement of public policy found in *N. J. S. A.* 9:3–17 is that "it is necessary and desirable (a) to protect the child from unnecessary separation from his natural parents . . . ." The second, emphasizing the drastic and final nature of a judgment of adoption, is the effect of such a judgment, specifically set forth in *N. J. S. A.* 9:3–30: "The entry of a judgment of adoption shall terminate *all relationships* between the child and his parents, and shall terminate all rights, duties, and obligations of any person which are founded upon such relationships . . . ." (emphasis supplied), except that when the adopting parent is a stepparent and the adoption is with the consent of one natural parent, the adoption shall not affect the relationship between the child and the consenting parent nor the right

of inheritance by intestacy from the other natural parent. The other side of the coin, specified by the same section, is that "[t]he entry of a judgment of adoption shall establish the same relationships, rights, duties and obligations between the child and the adopting parent as if such child were born to such adopting parent in lawful wedlock," including the right to inherit by intestacy.

This means that, on the one hand, a non-consenting natural parent is thereby permanently cut off from all parental rights and benefits, tangible and intangible, including even the privilege of seeing and visiting his child, as if it were never his, and, on the other hand, the child is forever deprived of every connection with and benefit from his parent except the right to inherit. Adoption, being immutable, is quite different from a mere award of custody, which is impermanent and subject to alteration as changing circumstances require. These weighty incidents dictate that a court must act with great caution and circumspection when one natural parent does not consent to the proposed adoption, particularly in the divorced parents situation. As the Appellate Division put it in a similar case: "Such an action [a judgment of adoption] is of the first magnitude and should be sanctioned only after serious consideration of the consequences . . . . The child's relationship with the parent is of such significance that all doubts are to be resolved against its destruction." *In re N.*, 96 *N. J. Super.* 415, 425 (App. Div. 1967).

The statutory procedural scheme provides first, upon the filing of the complaint (which cannot be done until the child has been living in the home of the plaintiff for not less than six months), for a court-ordered investigation and report to the court to be made by some approved agency. When the plaintiff is a relative (including a stepparent), as here, the investigation may be limited "to an inquiry concerning the status of the parents of the child." *N. J. S. A.* 9:3–23, subd. A(4). (We may digress to note that in the instant case the investigating agency failed to interview the

defendant natural father; its report therefore was of limited value to the court, but the deficiency was remedied by a full exploration of his status at the hearing.)

The second step in the procedural scheme is a two-stage process — a preliminary hearing and a final hearing separated by a period of time. *N. J. S. A.* 9:3–23 to –27. When, however, as here, the plaintiff is a relative or step-parent, the two hearings may be held successively on the same date and, as a practical matter, generally merge into one. *N. J. S. A.* 9:3–25, subd. A. Nonetheless the differing purposes and issues of the two hearings should be adhered to. *N. J. S. A.* 9:3–24 specifies the questions to be determined at the preliminary hearing; subsection C thereof indicates that the prime question is whether the non-consenting parent should have any "further right to custody of the child." This terminology must be taken to mean, at least in the divorced parents situation when the preliminary and final hearings are being held at the same time, nothing less than whether all parental rights should be permanently terminated. Here the only pertinent statutory standard for determination of this question is whether the natural father has "forsaken parental obligations,"[1] defined, *N. J. S. A.* 9:3–18(d), as "willful and continuous neglect or failure to perform the natural and regular obligations of care and support of a child." We construe this, again in the present context, to require a past course of conduct amounting to intended abandonment or very substantial neglect of both parental duties and claims, with no reasonable expectation

---

[1]*N. J. S. A.* 9:3–24, subd. C also sets forth as an alternative basis: if [the objecting] "parent . . . has been divorced by the other parent on grounds of adultery or desertion or extreme cruelty." Apparently the divorce here did not involve any of these grounds; in any event plaintiff has not urged this provision but rather only that relating to the forsaking of parental obligations. We are not therefore called upon to pass upon the question whether such a divorce, standing alone and without any proof of having forsaken parental obligations, is a valid basis for permanently terminating parental rights.

of any reversal of that conduct in the near future. The resolution of this question, often difficult, will, of course, depend upon the circumstances of each case.

It is clear to us that if such is not established upon a thorough consideration of all the evidence, the rights of a natural parent may not be cut off, adoption must be denied at that point and the case should proceed no further. On the other hand, if it is found that parental obligations have been forsaken and parental rights should be cut off, the court then proceeds to a determination of the question which would be decided at a final hearing if the hearings were separated by a time interval, *viz.*, whether "from the report and the evidence presented . . . the best interests of the child would be promoted by the adoption." *N. J. S. A.* 9:3–27, subd. C.[2] If that too is affirmatively found, then a judgment of adoption by a stepfather is in order.

█ The point to be emphasized is that the best interests of the child cannot validly ground a judgment of adoption without it first having been determined that the parental rights of the non-consenting parent can and should be terminated. We believe this to be the intended rationale of our cases (*see* particularly *In re N., supra* (96 *N. J. Super.* 415); *In re Jacques,* 48 *N. J. Super.* 523 (Ch. Div. 1958), the only decisions we know of dealing with the divorced parents situation), although expressions may be found in some opinions which might be understood to suggest that the court's belief as to the best interests of the child was of paramount importance without regard to whether parental obligations could be said to have been forsaken. Any such expressions are disapproved.

---

[2]The preliminary hearing section does contain a provision, *N. J. S. A.* 9:3–24, subd. D, empowering the court to deny adoption at that point if, during the course of that hearing, it appears that the best interests of the child would *not* be served by the adoption. The provision is of no practical significance when the preliminary and final hearings are held together.

Turning to the facts of this case, the natural parents were married in January 1963, when he was about 20 years old and she 21. Both prior to and after the marriage defendant had been found guilty of several juvenile and criminal offenses. In the later years they stemmed from narcotic addiction. Some of them resulted in incarceration, culminating in the service of a term in Bordentown Reformatory from February 1, 1966 until January 21, 1969. When defendant was out of jail, he worked for his father, who also saw to it that the wife and children were adequately housed, clothed and fed. Despite his criminal behavior, defendant was, according to his wife, "pretty nice" to the children and apparently had affection for them. His wife or his father brought them to visit him at Bordentown.

His wife obtained a purported uncontested divorce from defendant in Alabama on January 31, 1968 (while he was still confined in Bordentown), which awarded her custody of the children, but made no mention of visitation rights or support. When he signed papers in connection therewith at her request, she told him he could see the children when he came home from prison. Ten days later she married plaintiff and she and the children have since resided at the home of plaintiff, who has supported them. The home life appears to have been happy and congenial. (A child has since been born of this union. Defendant also has since remarried.)[3]

After his release from Bordentown in January 1969, defendant visited his children every week. He made a respectable appearance and the children were willing and eager to see him. As the Appellate Division said, it is clear from the record that he loves his children and that

---

[3]We understand litigation is now pending (brought by defendant's second wife), challenging the validity of the Alabama divorce, which, if successful, would affect the validity of plaintiff's marriage to the children's natural mother and plaintiff's status in the instant action. We will treat the situation, however, on the theory that the divorce is valid.

they are fond of him. His parents also visited them. These visits continued until March 1969, when his former wife told him that, if he wished to continue to have visitation rights, he would have to contribute to the children's support. Since he had just obtained employment, he was unable to do so and asked for a six month period of continued visitation, after which he would try to work out a support agreement. She refused, having already decided she wanted plaintiff to adopt the children. The complaint for adoption was filed shortly thereafter. Not wishing to aggravate the situation, defendant ceased to try to see the children. However, he did telephone them and he and his parents sent them gifts. The children appeared to be disappointed when the visits ceased. In July 1969, defendant offered to pay $20 a week for the support of the children. The offer was refused, apparently on advice of counsel. Since then he has deposited that weekly sum in a bank account.

The adoption hearing was not held until December 1969. Defendant presented substantial evidence of rehabilitation. He demonstrated that he had not used drugs since the commencement of his incarceration in Bordentown and that he was the successful operator of a parking lot, with a steady income. He reiterated his affection for the children and his desire to associate with them, although content that they continue to live with their mother and plaintiff.

The trial judge approached the case on the premise that "the best interests and welfare of the children should be the paramount consideration of the court in an adoption proceeding," which, as we have indicated, is not reached unless it is first found that the paternal rights of the natural parent can and should be permanently terminated. He did conclude that defendant's past criminal record and life sufficiently established "unfitness," "abandonment" and "neglect," but considered this aspect more as if an award of custody were involved than an adoption. We consider his determination to be erroneous on the proofs. A criminal record alone is not sufficient to cut off parental rights. The strong

evidence of rehabilitation, to which the court gave no weight, overshadowed past failures. If the judge had doubts as to the future, he should have adjourned the matter for an extended period to see whether defendants reform continued, rather than to order the drastic and irretrievable step of adoption. It may be added that the judge looked at the matter of the best interests of the children largely from the standpoint of the welfare of the entire family relationship and on the thesis that it is psychologically harmful for young children to have two fathers, so to speak. Were this a decisive criterion, adoption by a stepfather would have to be allowed in practically every case of divorce and remarriage of the mother. This cannot be either sound sense or sound law in an age when the divorced parents situation is not uncommon.

The majority of the Appellate Division followed the same general approach and, while appreciating the delicacy of the situation, expressed accord with the trial court's conclusion, saying that defendant's past life and behavior "require the granting of this adoption for the best interests of the children." The dissenting judge felt, as we do, that the forsaking of parental obligations had not been sufficiently established.

After the judgment of the trial court had been stayed pending appeal, defendant applied to the Chancery Division for visitation rights, which were granted. Since that time, as we were advised at oral argument, defendant has visited his children regularly and all parties are happy with the relationship. It also should be noted that we were informed, without dispute, that his reform and rehabilitation have satisfactorily continued.

We are firmly of the view that the facts here do not justify the permanent termination of parental rights and that adoption should not have been ordered. This requires a reversal of the judgments below, without prejudice, however, to an application by plaintiff to reopen the case in the event at any time in the future defendant's conduct is such that he can be properly said to have forsaken his parental

obligations. In the meantime, he should, of course, on the one hand, have full rights of visitation, and on the other, provide adequate support for his children. It is to be earnestly hoped that his reformed way of life will continue and that the children will enjoy full affection and care from both their natural parents and their stepfather.

The judgments of the Appellate Division and the County Court are accordingly reversed. No costs.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN.—7.

*For affirmance*—None.