127 N.J. Super. 311 (1974)
317 A.2d 382
IN THE MATTER OF THE ADOPTION OF A CHILD BY R.D. AND V.D.
Superior Court of New Jersey, Appellate Division.
Argued March 4, 1973.
Decided March 22, 1974.
*312 Before Judges CONFORD, HANDLER and MEANOR.
Mr. Stuart L. Pachman argued the cause for plaintiffs-appellants (Messrs. Clapp & Eisenberg, attorneys; Mr. George S. Fischler, of counsel).
Mr. Claude J. Minter argued the cause for defendant-respondent (Messrs. Schenck, Price, Smith & King, attorneys; Mr. Edward W. Ahart, on the brief).
*313 The opinion of the Court was delivered by CONFORD, P.J.A.D.
This is an appeal from an order in an adoption proceeding directing that plaintiffs, intended adopting parents, surrender custody of the child in question to defendant K., its natural mother. The order in effect dismissed the adoption proceedings.
The child was born to Miss K., a Pennsylvania resident, in a Philadelphia hospital January 6, 1973, and was turned over to plaintiffs, New Jersey residents, by Miss K. and R., the natural father, at the hospital on January 9, 1973, the latter both signing affidavits expressing a present intent to give up the child for adoption because they "were not married and [were] unable to care for the child." Plaintiffs have had custody of the child ever since, the order under appeal having been stayed pending the appeal. No issue of choice of law is raised in this appeal, and we apply New Jersey law.
When K. was given notice of the pendency of this proceeding in July 1973 she decided to resist the adoption and engaged counsel to contest it. It appears that K's doctor during pregnancy and delivery, a Dr. R., was instrumental in indicating the possible availability of K.'s child for adoption to the plaintiffs through Mrs. D.'s mother, a Philadelphia church acquaintance of Dr. R. Moreover, he made the physical arrangements for the actual delivery of the child to plaintiffs at the hospital. The trial judge found that K. was under such "pressure" under the attending circumstances, partially contributed to by the acts of Dr. R. both before and after the birth of the child, as to compel the conclusion that her surrender of the child was not "full, free and understanding." Although the judge expressly found that the best interests of the child would be served by leaving it with plaintiffs, he felt that the adoption statute precluded severance of the natural mother's right to the child unless she could be found to have "forsaken parental obligations," N.J.S.A. 9:3-24(C), a finding he could not make in the absence of a *314 showing of a voluntary, free and understanding surrender by her of the child.
We agree with the trial judge's concept of the law but disagree with his factual conclusion that the surrender by K. of the child was not voluntary, free and understanding, in the context of the statutory purposes and objectives. Our decision is not affected by considerations of appraisal of credibility of witnesses, as to which the superior vantage point of the trial judge ordinarily carries considerable weight. We accept the judge's conclusion that Dr. R.'s testimony was in some instances not deserving of credence and his implication that Dr. R. was biased in favor of plaintiffs. We also accept the judge's favorable impression of the general credibility of K. But objective facts and circumstances apparent to us from the record as a whole impel the conviction that although K. was unhappy about her decision at the time she acted on it and over the considerations which motivated her to make it, the decision was nevertheless deliberate, long under consideration, and with clear knowledge of its probable consequences. In such circumstances we are satisfied that the statutory factor of protection of the adopting parents "from later disturbance of their relationships to the child by the natural parents", N.J.S.A. 9:3-17(c), ought to have weighty effect.

I
Plaintiffs argue that the "best interests of the child" control in adoption and that that factor is here determinative, whether or not the trial court erred in finding the surrender of the child involuntary. Conceding that the best interests of the child seem to lie with her retention by plaintiffs as against her return to the immature and financially insecure K., we are persuaded that the analysis of the statute and the implications of the opinion in In re Adoption of Children by D., 61 N.J. 89 (1972), preclude a cutting off of the parental rights of a natural parent under the aegis of the adoption *315 statute unless that parent has forsaken his parental obligations. Id. at 94. While it is true that the court there qualified its construction of N.J.S.A. 9:3-24 to require a prerequisite determination at the preliminary hearing that the natural parent has forsaken parental obligations, by use of the phrase, "at least in the divorced parents' situation,"[1]Ibid., we can discern no rational basis for not requiring that prerequisite in the instant situation. The statutory language makes no distinction, in this regard, as to the case of an adopting parent who is not related to either of the natural parents. And considerations of natural justice would seem to militate against a construction of the statute which could deprive a natural parent of her child without the showing of an abandonment or forsaking of the child by that parent, regardless of whether the child would be better off with others. See In re N., 96 N.J. Super. 415, 421-423 (App. Div. 1967) which was cited in In re Adoption of Children by D., supra, 61 N.J. at 93, for its statement that "The child's relationship with the parent is of such significance that all doubts are to be resolved against its destruction" 96 N.J. Super. at 425.
Any reported cases reflecting a different viewpoint must be regarded as disapproved by the Supreme Court's holding and admonition in In re Adoption of Children by D., supra. See 61 N.J. at 95.
In relation to the question of the fitness of the plaintiffs to rear this child, it may be noted that Mr. D. is an administrative officer at a college. Mrs. D. was a school teacher but gave up the job to take over the care of this child and another, about a year older, which they shortly thereafter accepted for adoption. The D's are about 30. The probation report and testimony by physicians and others demonstrate that optimum conditions for the welfare of the child exist in the D. home. There was expert testimony by a psychiatrist *316 as to the possibility of serious permanent psychological injury to the child if she were removed from Mrs. D's care at her then age. Cf. In re P. and wife, 114 N.J. Super. 584, 593 (App. Div. 1971).

II
We turn to the question whether the trial court's determination that the surrender of the child was not voluntary can be sustained.
K., 18 years of age, unmarried and a recent high school graduate who lived with her mother, consulted Dr. R. on August 1, 1972 and was informed by him that she was four months pregnant. They discussed her plans. She did not want an abortion and told the doctor she would discuss adoption with R., the child's natural father, who was 19. Although R. was upset at the news of the pregnancy, he at first agreed to marry K., but within two weeks he changed his mind, and from that time forward, although he continued to see K., adamantly rejected her repeated requests that he undertake to support or "be a father" to the child after its birth. He thought that would interfere with his plans for the future.
K. informed Dr. R. of R.'s decision. Dr. R. recommended that if she was thinking of adoption she consult Catholic Social Services concerning arrangements therefor. She went there October 6, 1972 and discussed her "plan" for adoption with a case worker for about an hour. She indicated to the case worker that she had done some library research on the subject of adoption. However, she did not like the approach of the case worker and never went back to the agency. K. testified that when she next visited Dr. R. and told him she was not going to proceed through the Catholic agency he informed her that she would need an attorney in adoption proceedings and that she told R. that he should obtain one. (Dr. R. testified he did not advise K. to seek legal advice.) At the same time the doctor told K. he knew of a young *317 married couple in New Jersey who would be willing to take and adopt the child. He had reference to plaintiffs, Mrs. D. being the daughter of an acquaintance of the doctor, a Mrs. M., who had previously asked the doctor for help in finding a child for her daughter to adopt.
K. testified that she authorized Dr. R. to inform the prospective adopters that he had a "single mother" but told him she was not sure what she was going to do. It depended on R. Dr. R. testified that K. unqualifiedly agreed to adoption by this couple and never signified a change of mind to him. By November 1972 K. admittedly was aware that the couple had been told about the child and were ready to take it at birth. She testified that Dr. R. requested that if she changed her mind about the adoption before the birth she should so advise him. There was testimony that she told one of her friends that Dr. R. was arranging an adoption. There is no indication in the record that she ever told the doctor she had a change of mind, although it is a fair conclusion from all the testimony that she entertained an inner resolution to keep the child if R. should change his mind about accepting and caring for it. But he never did. She was also influenced by the fact that her relations with her mother were not good. The mother had told her she could stay at home with the child but only if she gave up R.
K. went into labor about January 4 or 5, 1973 and was delivered of the child January 6, 1973. She testified that Dr. R. informed her in the hospital that "once [she] signs the baby over, it is forever." He asked her whether "it is O.K. to go through with the plans that we've made." She said she was not sure; she wanted to talk to R. Dr. R. asked whether she could obtain a notary for the execution of the adoption consent papers. When she responded that this was "up to R.," he told her he would have the other people get one. R. visited her in the hospital every day but continued to reject her continued tearful entreaties that he accept the *318 child. He said "I don't want the baby * * * It's better this way" (adoption).
Dr. R. had told K. before the confinement that if she was going to surrender the child it would be better that she not see it, and he arranged with the hospital that the child be kept on another floor. It was arranged that the mother and child be discharged from the hospital on January 9, 1973. An attorney for the D's had prepared affidavits of consent to the adoption, and both K. and R. signed them before a notary public who first read the document to them. K. was weeping softly during this procedure. She testified that she understood when she signed the document that she was surrendering the child forever but had done so only when R. rebuffed a last-minute effort by her to change his mind. The baby was handed to R. by a nurse in the presence of K. and by him to Mrs. M., mother of Mrs. D., and the D's took the child away.
K. testified she began to entertain thoughts of recovering the child in May or June 1973. (She had gone to live with R. in April.) Nevertheless, when she received a request for the child's birth certificate from the D.'s through Dr. R. she sent it to him on June 6, 1973 with a request that he inform "the baby's parents" that the officials wanted a first name of the child for their records. Overt action on K.'s part to recover the child occurred only after she received notice of these proceedings. A post-hearing probation report indicates that K. is now residing in New Jersey with an aunt and uncle of R. who indicate they will support K. and the child in their home if it is returned to her. What K.'s prospects with R. may be in any such event is not reflected by the record.
We cannot agree with the trial judge that Dr. R. exercised any undue pressure on K. While his wisdom in participating in the arrangements for the turn-over of the child may be questionable, the objective facts of record refute undue pressure by him. His first advice to K. when she discussed adoption with him was the sound recommendation to *319 avail herself of the Catholic Social Services, apparently an approved adoption agency in Pennsylvania. Only after she rejected that recourse did he volunteer the availability of the D.'s to adopt the child. And in that regard (according to her) he recommended that she obtain legal advice. Accepting her testimony, she tentatively agreed to that proposal when it was proffered and never rejected it. The trial judge described her as a headstrong person. There is no fair basis for a conclusion that she was coerced by anyone into surrending the child  certainly not Dr. R. The fact that she would have preferred to have a family with R. and the child, and was upset over his refusal to acquiesce, cannot derogate from the entirely rational and volitional nature of her decision to give up the child  underscored symbolically by her signature on a document she thought signified surrender of the child "forever." If the normal emotional distress of a surrendering parent or the inherent pressures of a situation involving the giving up of her child by an unwed mother shortly after its birth were held sufficient, months later, to vitiate an otherwise voluntary decision, few surrenders for adoption by unwed mothers would stand. See In re Surrender of Minor Children, 344 Mass. 230, 181 N.E.2d 836, 839 (Sup. Jud. Ct. 1962); In Re Adoption of F----, 26 Utah 2d 255, 488 P.2d 130, 131, 134 (Sup. Ct. 1971).
The entirety of K.'s conduct, before, at, and after the physical surrender of the child, constitutes a forsaking of parental obligations within the intent of N.J.S.A. 9:3-24(C). There should therefore be an adjudication that K. "has no further right to [the] custody of the child." Ibid. In so holding, we read the statutory criterion of "forsaking" etc. in pari materia with all the other provisions of the act, including, as noted above, the need for protection of adopting parents from "later disturbance of their relationships to the child by the natural parents." N.J.S.A. 9:3-17(c).
The order under appeal is reversed and the cause is remanded to the county court further to be proceeded with consistently with this opinion. No costs.
NOTES
[1] In the "D" case the adopting parent had married the divorced wife of the natural father of the child.