[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
By petitions filed on November 13, 1990, the Commissioner of the Department of Children and Youth Services (DCYS) seeks to terminate the rights of Sally B. and Gary B. in and to their children, Sonja A., Paul G., and Samantha J. These petitions have been brought pursuant to Gen. Stat. Sec.17a-112 (a), whereby the Court has jurisdiction with respect to any child previously committed to DCYS in accordance with Gen. Stat. Sec. 46b-129 (d). All three children were found to be uncared for on April 19, 1990, on which date Paul was committed to DCYS for eighteen (18) months, Samantha was ordered placed in Protective Supervision for six months, and an existing Order of Temporary Custody for Sonja was continued in effect. On June 8, 1990, Sonja and Samantha were committed to DCYS for eighteen (18) months. When the petitions were filed, Sonja was six and a half years old, Paul was five and one-third years old, and Samantha was three years and ten months old.
On December 12, 1990, both parents were defaulted for failure to appear, service having been found on each, and the case was continued to trial to January 2, 1991. Mother appeared on January 2, 1991, and counsel was appointed for her. Father appeared and was advised to request a court appointed attorney or retain his own attorney. The case was continued to March 6, 1991 for trial, and thence to April 3, 1991, when Mother appeared for trial with her attorney; Father did not appear and was defaulted.
Each petition alleges the following statutory grounds:
(1) Abandonment by the parents in that they failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the children.
(2) Failure of the parents to have achieved such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, they could assume a responsible position in the life of the children.
(3) Acts of commission or omission by the parents resulting in a denial to the children of the care, guidance or control necessary for their physical, educational, moral or emotional well-being. CT Page 5832
(4) There is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child, and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interests of the child.
The petitions allege that all of the above listed grounds have existed for not less than one year as to the father, and all except abandonment as to the mother, and that the totality of the circumstances surrounding the children indicate that a waiver by the court of the one year requirement as to abandonment by mother, is necessary to promote the best interest of the children.
Before proceeding to the merits of the DCYS allegations, mention should be made of the structure of a termination proceeding. A petition to terminate parental rights consists of two phases; adjudicatory and dispositive. Conn. Practice Book, Sections 1042, 1044, 1049. These two phases, however, do not have to be the subjects of separate hearings. One unified trial, such as occurred in these cases is permissible. In re Juvenile Appeal, 192 Conn. 254, 259
(1984).
Although the procedure of one trial is sanctioned, the two phases serve distinctive purposes. In the adjudicatory phase, the court determines the validity of the grounds alleged, and therefore is limited to events occurring before the filing of the petitions on November 13, 1990. The dispositive phase is concerned with what action should be taken in the best interest of the child, and as to that phase, the court is entitled to extend its consideration to matters occurring until the end of the trial, which, in these cases, was May 2, 1991. In re Juvenile Appeal, supra at 267-68, n. 14. The dispositive phase is not reached unless at least one of the grounds alleged in the petition is proved by clear and convincing evidence. Gen. Stat. Sec. 17a-112(b); In re Migdalia M., 6 Conn. App. 194, 208, cert. denied,199 Conn. 809 (1986).
At the trial, the court received testimony from Dr. Gregory Runkel, a pediatrician ; Dr. David Mantell, a psychologist; Bonnie Resnick, a DCYS social worker ; Dr. Douglas Su, psychologist; Dr. Tanash Atoynatan, a child psychiatrist; Belinda Stimpson, foster mother; Susan Phillips, DCYS Social Worker; Pam McCarthy, Mental Health Worker; Mark Zoback, Administrator, East Connecticut Special Education Programs; Dalia Leal, foster mother; Alan Anderson, CT Page 5833 Mother's stepfather; Deborah Anderson, maternal grandmother; Michael Caldon, Mother's boyfriend; and Sally Bengston, Mother.
Received into evidence were reports of Dr. Mantell, covering his evaluations of December 15, 1989, and January 26, 1990, letters from Bonnie Resnick of DCYS to mother, Service Agreement dated February 1, 1990, admitted for the limited purpose of showing that mother was notified by DCYS of their expectations of her as stated in the Service Agreement, Expectations dated April 19, 1990, Newington Children's Hospital PEDAL Summaries on both Paul and Sonja, Newington Children's Hospital Discharge Summary on Samantha, various documents from the court file stapled together as Petitioner's Exhibit 11, various letters to mother and Michael Caldon from Susan Phillips of DCYS, letters from Susan Phillips to Debbie Anderson and (Attorney) Jim Purnell, and a letter to (Attorney) Ruhe from members of Deborah Anderson's family.
 III
From the testimony and documentary evidence, the court finds the facts hereinafter set forth to be relevant and material to the three petitions.
Sonja Bengston was born on May 19, 1989, Paul on July 16, 1985, and Samantha on January 17, 1987. Mother and Father lived together from the time of their marriage in March of 1984 until January 1988, when Father left the family residence.
On February 27, 1989, Mother delivered the children to Father because she no longer had adequate housing for them. The next day he told her that he had given the children to DCYS. She did not contact DCYS to ask about the children for nine days. On March 31, 1989, she agreed to place the children in the temporary custody of the State. The first time she visited the children was on April 19, 1989.
For a short period following the children's placement, Father called their foster home, but he did not visit them and has not seen them since February 27, 1989, the day he placed them with DCYS. He has had no contact of any sort with any of his children since February 1989.
In May of 1989, Mother moved in with her boyfriend, Michael Caldon, in Southwick, Massachusetts. At that time Paul and Samantha were in a foster home in Stafford, Connecticut, and Sonja was in a Scotland, Connecticut foster CT Page 5834 home. Mr. Caldon had a car, which was available to Mother, until October 22, 1989, when it was wrecked in an accident. After that, Michael and Sally usually had access to a car owned by his employer, which was a business of his family's.
From March 1, 1989, until December 31, 1989 Mother visited Sonja four times, the last of which was in the Summer; and Bonnie Resnick, Social Worker, picked Sonja up once for a visit with her mother away from the Stimpson home. From January 1, 1990 through March, 1990, Mother did not visit Sonja at all, nor was Sonja brought to see Mother, except possibly two on three times. In 1989 Mother telephoned several times to arrange visits, but usually she would not come. She would ask how Sonja was. She called Mrs. Stimpson once in October of 1990, because she had been left a message to call a Social Worker at DCYS, and could not reach her. When she called, she did not leave a phone number where she could be reached. (Testimony of Belinda Stimpson.)
Mother visited Paul and Samantha, who were in the same foster home, once in May 1989, not at all in June, then sporadically during the rest of 1989, and fairly consistently in early 1990.
Several scheduled visits were not kept, without any phone call from Mother to Foster Mother, which was upsetting to the children. (Testimony of Bonnie Resnick, DCYS Social Worker).
On April 19, 1990, Mother appeared in court and admitted that all three children were uncared for, and agreed on the following disposition, which was ordered by the court.
Samantha to return home under Protective Supervision: Sonja's OTC continued until end of school year when she will be returned home under Protective Supervision: Paul will remain in foster care under order of Commitment: It was agreed that after one more weekend visit with Samantha, Mother would pick Samantha up for her return home under the Protective Supervision order. Not only did Mother not pick up Samantha to bring her home, she had no contact whatsoever with any of her children, the foster parents, or DCYS, from April 19, 1990 until after the November 13, 1990 petition, a period of seven months, except for a call she made to DCYS on October 5, 1990, after hearing that Susan Phillips had called her boyfriend. When she could not reach Susan, she called Sonja's foster mother, but did not leave her telephone number. At the above court hearing on April 19, 1990, at which Mother was present, the court set expectations for her which she totally ignored. CT Page 5835
By court order, Mother had been evaluated by David Mantell, a licensed psychologist, on December 15, 1989, after missing two previous appointments, and on January 26, 1990, with the children and her boyfriend. Dr. Mantell testified that Mother had a personality disorder, that she was not likely to be a good candidate for therapy and that he could see no reason why she was not moving forward towards providing a home for the children. He also said that Mother's complete severance from children's lives for about six months is a significant statement of her interest in them, would severly [severely] damage them, and might break the mother-child bond.
Dr. Mantell also told Mother on January 26, 1990, in the presence of her DCYS worker that if she did not provide a home for her children within three months, he would recommend termination of her parental rights, because it is damaging for the children, who are bonded with her, to be out of her direct care, and that that damage is progressive (Petitioner's Exhibit 2).
Bonnie Resnick testified that during the time Mother was supposed to be arranging for suitable housing for her children, her boyfriend was bringing home approximately $1000.00 more per month than the total of their living expenses, and had $2,000.00 in savings.
Dr. Mantell also testified that in January 1990, Michael Caldon, Mother's boyfriend, whom she was planning to marry, did not seem to have any personal interest in the children.
Mother did not appear at case status conferences on October 11, 1989, December 6, 1989, January 10, 1990 or March 27, 1990, nor at an in-court judicial review on September 15, 1989, although she appeared in court as scheduled on several other occasions in connection with petitions filed.
Dr. Gregory Runkel, a pediatrician, examined Paul and Samantha on April 17, 1989 and Sonja on April 18, 1989, at which time Paul was three years and nine months old, Samantha, two years and three months old, and Sonya almost five years old. Paul was very fearful, with significant speech delay and stool withholding for up to a week. His weight was normal and he had been receiving speech and special education therapy while living in Massachusetts. Dr. Runkel felt that Sonja had significant problems, such as a failure to thrive, a lack of stimulation in the home which caused her to spend long periods of time rocking back and forth in a sitting position. There were concerns about her CT Page 5836 behavior, she had real speech problems, developmental delays, and in many ways she was like a two and a half year old child. She was not toilet trained. Samantha's exam showed her to be normal.
Sonja's problems have lessened significantly since she has been in foster care, she plays with other children and with dolls, she loves people, and her speech gradually improved. She never mentions her mother and calls her foster mother `mommy'.
When Paul was evaluated at Newington Children's Hospital on October 25, 1989, he was four years, three months old. On the Vineland Adaptive Behavioral Scales, he had an adaptive behavior composite of two years three months. He was described as having an Oppositional Defiant Disorder and a Separation Anxiety Disorder and low frustration tolerance. The report stated that he was oppositional and defiant, has lied, is somewhat self destructive and self injurious, and destroys property. The Pedal Program's recommendation was that "certainly, this youngster requires a consistent, supportive, and nurturant home environment. Additionally, individual therapy is indicated to address his vulnerabilities and behavioral acting out. Counseling with his caretaker for management of his behavior is also indicated." (Petitioner's Exhibit 8).
When Sonya was evaluated at Newington Children's Hospital on October 17, 1989, she was about five and a half years old. Her Psychological Evaluation indicated that "Her pattern of cognitive and emotional deficits is similar to the pattern of deficits exhibited by children who have experienced a disruptive influence early in life, which inhibits their development in various ways. Sonja exhibits emotional symptoms of depression and anxiety and difficulty forming secure attachments. Her general development is delayed: cognitively, socially and emotionally." The psychologist recommended that "Sonja should receive secure placement in a home where she will receive attention nurturance, support and structure so that she may develop to her potential" (Petitioner's Exhibit 10). Sonja was found to be functioning generally at approximately a two year level in most areas, although she was five and a half.
The Hospital Report contained the following statement: "He would strongly advocate that this youngster be afforded a secure environment where structure, maintenance, predictability and reliability are present."
Samantha was found by Newington Children's Hospital to CT Page 5837 be normal, although at risk because of her social history.
IV LAW
The controlling law in Connecticut on termination of parental rights as stated in In Re Luis C., 210 Conn. 157,164-65 (1989), is as follows:
 "The termination of parental rights is defined as `the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent. . . .' General Statutes Sec. 17-32a(e) (Rev. to 1972) (now Sec. 45-61b(g)). Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children `undeniably warrants deference and absent a powerful countervailing interest, protection.' Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551
(1972); see In re Appeal of Kindis, 162 Conn. 239, 240, 294 A.2d 316 (1972); Cinque v. Boyd, (99 Conn. 70, 82, 121 A. 678 (1923)). Anonymous v. Norton 168 Conn. 421, 425, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S.Ct. 294, 46 L.Ed.2d 268 (1975). Termination of parental rights is `a most serious and sensitive judicial action.' Id., 430.
 "Section 17-43a carefully sets out. . .four situations that, in the judgment of the legislature, constitute `countervailing interests' sufficiently powerful to justify the termination of parental rights in the absence of consent. The commissioner of children and youth services, in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. No all-encompassing `best interests' standard vitiates the requirement of compliance with the statutory criteria. See Alsager v. District Court of Polk County, (406 F. Sup. 10 (S.D.Iowa 1975), aff'd, 545 F.2d 1137 (8th Cir, 1976); In re Adoption of Children by D., 61 N.J. 89, 293 A.2d 171 (1972); Malpass v. Morgan, 213 Va. 393, 192 S.E.2d 794
CT Page 5838 (1972); Ketcham Babcock,' Statutory Standards for the Involuntary Termination of Parental Rights,' 29 Rutgers L.Rev. 530, 539 (1976); comment, `Termination of Parental Rights in Adoption Cases: Focusing on the Child,' 14 J. Fam. L. 547, 550 (1975). In re Juvenile Appeal (Anonymous), 177 Conn. 648, 671-72, 420 A.2d 875 (1979)."
The termination of parental rights involves two phases: adjudication and disposition. The Court must first determine whether one or more of the statutory grounds that have been alleged have been proven. In Re Juvenile Appeal, 192 Conn. 254
(1984). A finding that statutory grounds exist must be made by proof of facts existing on the date the petition was filed or amended. Without such a finding, no inquiry may be made as to the ultimate best interests of the child. In Re Juvenile Appeal, 188 Conn. 259 (1982).
V. STANDARD OF PROOF
The standard of proof mandated by Connecticut General Statutes 17a-112 (b) and Practice Book Section 1049 is "clear and convincing evidence. "
 VI. PETITIONER'S CLAIM THAT ONE OR MORE STATUTORY GROUNDS EXIST
The petition claims as to both parents, that their parental rights in all three children should be terminated on all four statutory grounds:
1. Abandonment
2. Failure to Rehabilitate
3. Acts of Omission — Commission
4. No Ongoing Parent-Child Relationship
The petition also alleges that all grounds existed for at least one year except Mother's abandonment, and as to that claim, a waiver of the one year period is sought, as being in the best interests of the children.
Section 17a-112 (b) does not state when this one year period begins. This is a question of fact for the trier, to be based on the facts and circumstances of the particular case. In Re Saba P., 13 Conn. App. 605, 609-610 (1988).
A. Abandonment CT Page 5839
Connecticut General Statutes Section 17a-112 (b)(1) defines this ground as the parent's failure to "maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
The standard of review for a claim of abandonment was established in In Re Juvenile Appeal (No. 9489), 183 Conn. 11,14-15 (1981) as follows:
 "Abandonment focuses on the parent's conduct. It is a question of fact for the trial court `which has the parties before it and is in the best position to analyze all of the factors which go into the ultimate conclusion that (the statutory standard of abandonment) has been satisfied.' In re Adoption of Webb, 14 Wash. App. 651, 657, 544 P.2d 130 (1975).
 In In re Adoption of Webb, supra, the court found that the father had abandoned the child `under circumstances showing a willful substantial lack of regard for parental obligations.' The court stated as follows: `The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.'"
It is not necessary for the absence of all five attributes to be proven in order for a finding of abandonment to be made.
1. As to Father, the Court finds that he made no bona fide effort to contact his children from February 1989 to November 13, 1990, the date of the petition, and therefore has abandoned them.
2. As to Mother, by any definition, she abandoned her children from April 19, 1990 until October 5, 1990 having no contact with them, DCYS or their foster parents whatsoever, and not even leaving a telephone number or address where she could be reached. Even her mother did not know where she was. On October 5, 1990, Mother returned a call the DCYS worker made to her boyfriend's business; the worker was not in so Mother left a message for a return call, but left no CT Page 5840 telephone number. Mother then called Sonja's foster mother to ask if she knew why DCYS was trying to reach Mother. She did not leave her telephone number with Sonja's foster mother. In the five and a half weeks between these phone calls and the filing of the petition, Mother again made no effort to be in touch with her children or even to follow up on the phone call.
Mother claims that the reason she did not contact her children from April 19, 1990, until the date of the petition, was that she did not want to split up Paul and Samantha. The Court finds that this is not a credible reason, in view of the fact that DCYS would not have forced Mother to take Samantha, and further because she ignored Sonya also during the period and did not even phone or send cards to any of the children.
The Court finds that Mother has abandoned her children and that the one year requirement should be waived as being in the best interest of the children. This waiver is necessary from the totality of the circumstances surrounding these children. They have been in foster care for more than two years, and should not have to wait any longer for a stable, secure, permanent home. The fact that Mother completely ignored her children for as long as she did in the face of a clear warning from Dr. Mantell in the presence of Mother and a DCYS worker that he would recommend termination if she did not provide a home for her children within three months convinces the Court that this waiver is necessary for the best interests of the children.
B. Failure to Rehabilitate
This ground is defined in Connecticut General Statutes Section 17a-112 (b)(2) as follows:
 The parents of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and the needs of the child, they could assume a responsible position in the life of the child.
There is no dispute that on April 19, 1990, the Court found the children to be uncared for; hence the first requirement of previous adjudication exists in the case at hand. CT Page 5841
The second element of this ground is the "failure to achieve a degree of personal rehabilitation." "Personal rehabilitation" as used in the statute refers to the restoration of a parent to. . .(her) former constructive and useful role as a parent." In Re Migdalia M., 6 Conn. App. 194,203 (1986).
1. Mother — In February 1989, Mother gave up her children to their father because she was unable to provide a home for them. The next day he turned them over to DCYS. On November 13, 1990, the date of the petition, almost twenty-one (21) months later, Mother had made no progress toward reaching a point that "would encourage the belief that within a reasonable time, considering the age and the needs of the child, she could assume a responsible position in the life of the child." In fact, not only had she not made any progress, she was going backwards, not having had any contact with her children in many months.
2. Father — Father's failure to be involved in any way in the lives of his children clearly establishes that he has not rehabilitated himself.
The Court finds that the evidence was clear and convincing that both Mother and Father have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, that they could assume a responsible position in their lives, and that this ground has existed for more than one year.
The Court also finds that even if this ground has existed for less than one year, that requirement is waived for the same reason it was waived in the Abandonment ground as previously discussed in this opinion.
Respondent Mother has argued in her Trial Brief (Pages 20 and 21) that the Failure to Rehabilitate ground existed, if at all, for less than one year, and that since the Petition did not request a waiver of the one year requirement, no such waiver can be found. The answer to this is that the Respondent Mother has not been prejudiced by the Petitioner's failure to request the waiver in the petition, because Mother's Brief has fully discussed the issue of Waiver of Twelve Months (Pages 34 through 39), and if the Court finds that a waiver is necessary to promote the best interests of the children, as it has, this is based on the facts and circumstances of the case, which are in evidence anyway, regardless of whether the request for waiver was made. CT Page 5842
C. ACTS OF COMMISSION OR OMISSION
The third ground is defined in Connecticut General Statutes Section 17a-112 (b)(3) as follows:
 The child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being.
The Petitioner did not prove by clear and convincing evidence, that prior to placement in February 1989, any of the children were denied the care, guidance or control necessary for their physical, educational, moral or emotional well-being.
Considering the time between placement and filing of the petition; whereas there was some evidence that Mother's cancelled visits and her failure to appear at Newington Children's Hospital for evaluation of the children might have affected the children's emotional well-being, the Petitioner has not sustained its burden for this ground as to either parent.
D. No Ongoing Parent-Child Relationship
Ongoing parent-child relationship is defined in Section17a-112 (b)(4) of the Connecticut General Statutes as follows:
 "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent/child relationship would be detrimental to the best interest of the child."
1. Father — The Petitioner has proved by clear and convincing evidence that Father has not had any relationship whatsoever with his children since February 1989, and that the allowance of any further time to establish or reestablish a parent/child relationship would be detrimental to the best interest of the children.
2. Mother — In its Trial Brief, Petitioner concedes that there is not sufficient evidence to establish this ground. The Court finds that the Petitioner has not sustained its burden on this ground. CT Page 5843
VII. DISPOSITION
Inasmuch as the Court has found that statutory grounds exist for termination of the parental rights of both parents as to all children, the Court must now consider whether it is in the children's best interest to enter an order of termination based on facts existing on the final day of trial, May 2, 1991. Based on those facts, the Court makes the following findings on the six (6) factors listed in Section 17a-112 (d).
(1) The timeliness, nature and extent of services offered or provided to the parent and the child by the agency to facilitate the reunion of the child with the parent.
DCYS offered Mother assistance by arranging visits, providing transportation, arranging therapy, writing letters to her as reminders and for clarification of discussions, and by reviewing expectations with her. Father was not available for services.
(2) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The Court set expectations for Mother in court on April 19, 1990, none of which she observed. Father was not in court, so no expectations were set for him.
(3) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Father — There is no basis for finding any emotional ties between Father and any of the children.
Mother — Prior to April 1990, the children were bonded with Mother, although Dr. Mantell testified that on January 26, 1990 he did not know how strong it was. She voluntarily removed herself from their lives from then until at least November 1990. The children do not ask for Mother and seem to have forgotten her. They appear to be doing well in their foster homes.
(4) The Age of the Child CT Page 5844
(a) Sonja was born May 19, 1984.
(b) Paul was born July 16, 1985
(c) Samantha was born January 17, 1987.
(5) The efforts the parent has made to adjust his circumstances, conduct or conditions to make it in the best interests of the child to return him to his home in the forseeable future, including but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the Court may give weight to incidental visitations, communications or contributions and (b) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Father — Father has done nothing to make children's return to him in the foreseeable future in their best interest.
Mother — Mother's failure to see her children, call them, or write to them from April, 1990, until after the Petition to terminate her Parental Rights was filed in November 1990, except for two telephone calls on October 5, 1990, one a return call to DCYS, and one call to foster mother, Mrs. Stimpson, which calls were not followed up on by Mother, outweigh whatever efforts Mother made prior to April, 1990, and after November, 1990.
(6) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent, or any other person, or by the economic circumstances of the parent. Neither the unreasonable act or conduct of anyone, nor economic circumstances, have prevented either Mother or Father from maintaining a meaningful relationship with their children.
Susan Phillips of DCYS testified that all three children are adoptable.
Having considered the foregoing, it has been clearly and convincingly proved that it is in the best interest of all three children for their lengthy period of foster care "limbo" to come to an end, so that they may finally know the security of a permanent home. The Court finds that the petitioner has proven by clear and convincing evidence that the best interests of the children will be served by terminating the parental rights of both parents to the CT Page 5845 children. Therefore it is ORDERED that the parental rights of Sally Bengston and Gary Bengston in and to Sonja Avis Bengston, Paul Gary Bengston and Samantha Jolene Bengston be, and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing these children forthwith in adoption, and that such Commissioner shall submit a written report to the Court as to the progress toward such adoption no later than ninety (90) days following receipt of this judgment. If adoption is not finalized by November 1, 1992, the Commissioner is further ORDERED to file a Motion For Review of Terminated Child by that date.
Hon. Richard A. Walsh Superior Court Judge